L. W. Tilden, J. W. Jones, T. M. Mink, E. C. Vick, Lizzie Williamson, George Williamson, A. Purdie, Elsie E. Hatfield, and J. W. Jones and C. H. Teal, Co-tenants, and A. W. Hurley, *Appellants*, v. C. F. Mather Smith, *Appellee.*

Division A.

Opinion Filed August 1, 1927.

*E. W. & R. C. Davis*, and *Maguire & Voorhis*, for Appellants;

*Massey, Warlow & Carpenter*, for Appellee.

Brown, J.—The appellants filed their bill in the court below to enjoin the appellee from lowering the waters of Lake Johns, one of the smaller lakes located in the lake

region of Central Florida, which, owing to very heavy rainfall, had overflowed his property, and the property of some of his neighbors, causing destruction of citrus groves, the submerging of appellee's golf course, the killing of pine and other trees of natural growth, and other property damage.

The bill alleges that the appellants are all owners of property abutting on Lake Johns, which is of greater area than two square miles and not included wholly within any drainage district created by Chapter 6456, Acts of 1913, or Acts amendatory thereof, or any other laws of the State of Florida; that appellee had caused to be drilled upon his property on the eastern margin of the lake a deep well to drain off the waters of said lake into the underground waters of the State of Florida, so as to lower the level of the lake, and had obtained from the State Board of Health a permit to do this; that the appellee had not obtained the written consent of all owners of property abutting on or bounded by said lake so to do, and that such acts of the defendant were in·violation of the laws of the State of Florida and an infringement upon the rights of appellants.

The answer of the appellee admitted that he was drilling a deep well upon his property, but denied that it was for the purpose of reducing the natural level of·the lake below the point which the growth and vegetation on the margin indicated to be the ordinary high water point of the lake. The answer further alleges that during the past two years and more, especially within the last six months of the year in which the answer was filed, there had been excessive rains which had caused the lake to rise above its natural boundaries and to flood the adjacent territory, particularly appellee's property known as the West Orange Country Club, which, constructed during a period of eight years at great expense, was flooded and rendered practically

worthless, and the several residences erected thereon were no longer fit for habitation owing to the flooded condition of the land. The answer also alleged that appellee's well was situated at a point higher than the level of the lake when within its natural boundaries.

The bill did not waive answer under oath, and the answer was sworn to. On application for injunction, the cause was heard on testimony taken before the chancellor in person and several affidavits submitted by the parties. The chancellor denied the injunction and the complaints took this appeal. This bill was evidently filed with reference to Sections 1190 and 1191, Revised General Statutes, derived from an act of 1915. These two sections read as follows:

1190. "It shall be unlawful for any person, persons, firm or corporation to drain or draw water from any lake of greater area than two square miles so as to lower the level thereof without first obtaining the written consent of all owners of property abutting on or bounded by said lake: Provided, however, That this Article shall not apply to any lake included wholly within any drainage district created by Chapter 6456, Acts of 1913, Laws of Florida, or acts amendatory thereof, or under any other laws of the State of Florida.

1191. "Courts of chancery shall entertain suits by persons claiming to own lands abutting on or bounded by lakes in the State of Florida, of greater area than two square miles, to enjoin any person, persons, firm or corporation from draining or lowering the level of such lake."

While the testimony was in conflict on some important points, there was evidence tending to show that Lake Johns, which was about seven miles long and about two or three miles wide, was not fed by underground springs, as so many Florida lakes are, but by the rainfall in the vicinity of the lake, which had no streams running into or

out of it. That there was considerable variation in the average maximum high water mark of the lake during a series of unusually dry years as compared with a series of unusually wet years, but nevertheless the character of the vegetation and trees around the lake gave some evidence of an average or ordinary high water mark, and indicated that the water level at the time appellee sunk his well was considerably above such average level of the lake as so indicated. See Martin, Governor, et al., Trustees, etc., v. Busch, decided at the January Term, 1927. The appellants were owners of property abutting on the lake, but so far as the evidence shows had not suffered like some of their neighbors, including appellee, from the unusually high water in the lake. The appellee was likewise the owner of considerable property abutting on the lake, which he used as a country club with a golf course, clubhouse, cottages for rent, etc., which cost him in the neighborhood of $150,000.00, and had yielded him some revenue before the property was flooded by the rise of the lake. That appellee began these improvements in May, 1915, at which time he had a survey made; that trees about the lake at that point then showed that the water had not been there for a great many years and the level of the lake was about 5½ feet below the surface of the adjacent land, on which there were trees about 35 years old. That Lake Johns maintained its then level until about 1923, when owing to heavy rains it began to rise and during the equinoxial storms of 1923 it rose during that month alone 15.2 inches. During 1923 and 1924 the waters rose about 7 feet and at the time the testimony was taken in December, 1924, appellee's golf course was submerged, the water was up to the clubhouse porch, where boats were tied, and all cottages or guest houses except one were uninhabitable. That a Mr. Hart who had homesteaded land nearby abutting on

the lake, in 1920, and had resided on it for 3½ years, had been compelled to abandon it, the water covering the floor of his house 1½ inches and killing several hundred trees on his place. That a tract which had been used as an aviation field by the Government in 1917-18 was submerged, and that on Mr. Seegar's grove, on the east side of the lake, the water had killed about 100 orange trees twenty years old, and nearly 800 small trees. That a Mr. Brock, who had bought Turkey Island in Lake Johns, in 1918, and used it mostly for trucking, had planted some 300 fruit trees and 100 avocado pear trees. That the water in Lake Johns were then about seven feet lower than at the time of his testimony; that the lake had flooded three acres of his vegetable land, had killed a dozen orange trees and injured many more which would probably die unless relief was afforded; that his boat house, which two years before he could enter standing upright in his boat, was completely submerged and his pump house flooded. One Arthur Speir deposed that he had lived on Lake Johns since 1881, and that the water was now several feet higher than it had been since that date; that there were pine trees 15 inches in diameter standing in the water of Lake Johns at the time of his affidavit; that pine trees were readily killed by standing water, and that if at any time prior to the present the waters had risen for any length of time so as to cover the ground on which the trees were standing, the trees would have died. The affidavit of C. S. Brock said that the present condition was absolutely abnormal; that he had known Lake Johns and Turkey Island for over thirty years and that the lake had never before done any damage to his knowledge. Mr. S. J. T. Seegar, witness for the defendant, testified that he had known Lake Johns for 37 years and had never seen the level of it so high as at present; that the high water

had killed about 100 of his trees, twenty years old, and had seriously damaged nearly 800 smaller trees.

There was testimony for the complainants to the effect that they had lived for a great many years on their lands adjoining the lake and had selected their locations with reference to the frost protection afforded by the lake to their vegetable crops; that the lake had many times been as high as it was at the time the bill was filed and that it was to the interest of those engaged in trucking on lands adjacent to the lake to maintain it at the existing high level on account of the frost protection it afforded, and that if the level were lowered during wet years, it would go entirely too low during dry years to afford the neces·sary frost protection.

On the whole there was ample evidence to sustain the action of the chancellor in denying the injunction. We quote as follows from the able opinion of the chancellor accompanying his order refusing to restrain the appellee from reducing the then existing water level of the lake by the method pointed out in his answer and testimony:

"Injunction being a summary and severe instrument of courts it should be used with great caution and the burden of proof is upon those seeking to invoke it to clearly show that great injury either temporary or permanent is impending and can be averted only by its use.

"The Court finds that the word 'level' in having reference to waters in lakes and ponds seem to mean a line at which the water usually stands when free from disturbing causes, or as the usual or ordinary height, or as the mean altitude or distance.

"The testimony in this case shows that the waters of Lake Johns are admitted to be much higher than its natural boundaries or level for many years past due to unprecedented rains for the last year or six months; that

this excess is shown to have killed orange trees, also pine trees many inches in diameter and several years old. In this case the burden of proof fails to show and the Court is therefore not prepared to hold that the 'level' of Lake Johns is at the point where the surface now overflows much valuable property to the depth of several feet. This is based upon the testimony of several older residents of that community, also upon exhibits to the Court showing the inundations of large trees, groves and buildings around the border of the lake resulting in serious damage to the owners.

"Equity cannot be invoked to prevent persons from undertaking to minimize a serious damage resulting from an abnormal condition merely for the purpose of minimizing or better securing others from a mere contingent danger such as frost protection, and more specifically when it is shown that Lake Apopka about twenty times the size of Lake Johns and nearly adjoining it is on the north and west of the same property of petitioners."

In 40 Cyc., p. 635, it is said: "The owners of land abutting on a private lake have the same right to make a reasonable use of the water for domestic, agricultural and mechanical purposes, but no one may appropriate or divert the entire body of water or make such an excessive use of it as to deprive others of their right to a reasonable participation in its benefits."

And again, on page 638-9 of the same volume, it is said: "A riparian or littoral owner whose right and privileges in the waters of a lake or of the stream issuing from it are unlawfully interfered with by operations which result in draining the lake, lowering its natural level, or diverting the water into another channel, may maintain an action for damages against the wrongdoer. And an action also lies against one whose operations cause the waters to be

set back and flood the land of another. * * * Where injuries to riparian or littoral rights of any of the kinds mentioned * * * are permanent in character, and such as could not be adequately compensated by a recovery of damages, the party affected may have the aid of a court of equity to enjoin the unlawful acts of defendant.'' 40 Cyc. 639. See also 27 R. C. L. 1190, Sec. 107.

But these propositions in the several cases cited by appellants all seem to be based upon such action as either raises or lowers the natural or ordinary level of the body of water. Thus in Sandburn v. People's Ice Company, 51 L. R. A. 829, cited by appellants, it is said, ''It is elementary that the shore owner may prevent an injury to his land by the lowering or raising of the waters beyond the natural limits of low and high water mark, by whatever means, in the exercise of rights common to all, unless such action be expressly authorized by law. If there is a remedy for an injury caused by the artificial raising of the water above the natural line, thus flooding a meadow, there is also a remedy to prevent exposure of an unsightly and unhealthy marsh by artificially drawing off the water below the natural level. It is immaterial for what purpose the shoreland is used, if it be a lawful use. There is no distinction in this respect between a farm and a summer residence. . Employment of contiguous land for the purpose of pleasure, recreation and health, constitutes such a use of adjacent bodies of public water as to command a remedy for an interference with its natural condition.'' See also Hazen v. Perkins, 23 A. L. R. 748, 752; Priewe v. Wisconsin State Land & Development Co., 33 L. R. A. 645, text 651; Lakeside Irrigation Co. v. Kibby, 166 S. W. 715; State et al. v. Great Fall Manufacturing Co. (N. H.), 83 Atl. 126.

Appellants seem to proceed on the basis that the common law rule as set forth in the authorities cited by them, when

construed in connection with the exact language of Section 1190 of the Revised General Statutes, means that a riparian proprietor on a pond or lake has no right to attempt to lower the level of the lake under any circumstances, no matter how unusual and unnatural the existing level may be. He may not endeavor to restore it to the usual or natural level. Appellants contend that whatever the level of the water happens to be, if caused by a natural cause, such as rainfull, that is the natural level or at least the level intended by the statute. If this theory were followed out to its logical conclusion, and Lake Johns should at some time from excessive rains rise high enough to cover the lands of the appellant, as well as those of the appellee, and those of all the shore owners except one, whose land happened to be on such a high promontory as to be above the flood waters, this one individual, refusing to consent, could under the statute quoted prevent all of the other riparian owners from taking steps to lower the lake down to its natural level and within its usual boundaries. But neither the statute nor the common law rule will bear any such strained construction. The law gives no man a vested right in a flood or a freshet, or conditions created thereby. As bearing on this point see Goodrich v. McMillan (Mich.), 187 N. W. 368, 26 A. L. R. 801, and notes. Statutes must be construed in the light of the common law, and the latter remains in effect in so far as the same is not clearly inconsistent with the statute. It is also well settled that government patents of lands bounded by navigable waters convey titles to the *ordinary* high water mark of such waters, and not to high water mark temporarily existing during flood or freshet or unusually high tides. 9 C. J. 182, 192, 193.

Flood waters which are of no substantial benefit to a riparian owner or to his land and are not used by him, may

be appropriated by any person who can lawfully gain access to the stream, and may be conducted to lands not riparian, and even beyond the watershed of the stream, without the consent of the riparian owner, and without compensation to him. But where the water in question although in a sense high water or flood water, is nevertheless a part of the regular and usual flow of the stream for a considerable period of each year, and at a time when such flow is of substantial use and benefit to the riparian lands, or the flow of such water in its accustomed place is necessary to the gathering of water in subterranean strata from which the owners of the underlying lands are entitled to take it, there is no right of appropriation for non-riparian use as against the riparian owners. See Gallatin v. Corning Irrigation Co., 163 Cal. 405, 126 Pac. 864, and Ann. Cases 1914 A, p. 74, with note on p. 82.

But the flood waters here in question were not shown to be a natural annual occurrence, or such as would create any rights of the kind pointed out in the above case and the many cases therein cited.

It is true that said Section 1190 makes it unlawful to lower the "level" of a lake without first obtaining the written consent of all property owners abutting on or bounded by the said lake. It will be observed that the statute does not make it unlawful to lower the *abnormal* level of a lake. It would be necessary to interpolate the word "abnormal" before the word "level" in order to construe this statute in such a way as to make unlawful the act of the appellee under the facts as found and construed by the chancellor. It is said by counsel for appellee in their brief that Dr. Johnson in his famous dictionary of 1755 defined the word level as "customary height." We have not endeavored to verify this definition but we are

satisfied that this was what the Legislature had in mind, and that it was not the intention of the Legislature in using this word "level" to give permanency to, or to prolong, abnormal and unusual conditions, fraught with such damage as the inundation of farm lands, homes, cattle and crops, but that the intention was to prevent any person from lowering the normal, usual and ordinary level of a lake without first obtaining the written consent of the owners of property abutting thereon. This word as used in the statute does not mean the abnormally low level of a lake during one of a series of excessively dry years, or the abnormally high level of a lake during an excessively wet year or series of wet years, but the average or mean level obtaining under fairly normal or average weather conditions, allowing the proper range between high and low water mark in average years. "The term 'lake,' when used in reference to a navigable body of fresh water in a conveyance describing one boundary of the land as being on the lake, is to be construed as fixing the boundary at the line at which the water usually stands when free from disturbing causes." Seaman v. Smith, 24 Ill. 521, 524; Fletcher v. Phelps, 28 Vt. 257, 261.

In Minnetonka Lake Improvement, 45 Am. St. Rep. 495, the Supreme Court of Minnesota said:

"In the case of fresh water rivers and lakes in which there is no ebb and flow of the tide but which are subject to irregular and occasional changes of height without fixed quantity or time except that they are periodical, recurring with the wet or dry seasons of the year, high water mark as a line between a riparian owner and the public is to be determined by examining the bed and the banks and *ascertaining where the presence and action of the water are so common and usual and so long continued in all ordinary years as to mark upon the soil of the bed a character dis-*

*tinct from that of the banks in respect to vegetation, as well as to the nature of the soil itself.* High water mark means what its language imports,—a water mark. It is co-ordinate with the limit of the bed of the water, and that only is to be considered the bed which the water occupies sufficiently long and continuously to wrest it from vegetation and to destroy its value for agricultural purposes. Ordinarily the slope of the bank and the character of its soil are such that the water impresses a distinct character upon the soil as well as upon the vegetation. In some places, however, where the banks are low and flat, the water does not impress on the soil any well defined marks of demarcation between the bed and the banks.

"In such case the effects of the water upon vegetation must be the principal test of determining the location of high water mark as a line between the riparian owner and the public. It is the point at which the presence and action of the water is so continuous as to destroy the value of the land for agricultural purposes by preventing the growth of vegetation, constituting what may be termed an ordinary agricultural crop."

In Dow v. Electric Company, 76 Am. St. Rep., the Supreme Court of New Hampshire said:

"The high water mark on fresh water rivers is *not* the highest point to which the stream rises in times of freshets, but is the line which the river impresses upon the soil by covering it for sufficient periods to deprive it of vegetation and to destroy its value for agriculture."

In spite of the very able brief and argument submitted in behalf of the appellants, we cannot bring ourselves to accept the construction of the statute for which they contend; and inasmuch as there was ample evidence to sustain

the chancellor's conclusion, on the facts, the decree appealed from will be affirmed.

Affirmed.

ELLIS, C. J., AND STRUM, J., concur.

WHITFIELD, P. J., AND BUFORD, J., concur in the opinion.