496 So.2d 153 (1986)
BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND, State of Florida, Appellant/Cross-Appellee,
v.
WALKER RANCH GENERAL PARTNERSHIP, et al., Appellees/Cross-Appellants.
No. 85-1698.
District Court of Appeal of Florida, Fifth District.
August 21, 1986.
Rehearing Denied October 28, 1986.
*154 Andrew S. Grayson and Lee R. Rohe, Asst. Gen. Counsels, Tallahassee, for appellant/cross-appellee.
Michael L. Rosen and F. Alan Cummings of Holland & Knight, Tallahassee, for appellee/cross-appellants.
COBB, Judge.
The issue for determination on this appeal is the jurisdictional boundary between Polk and Osceola Counties. The cause began when appellant, Board of Trustees of the Internal Improvement Trust Fund, State of Florida (Trustees), filed a petition for a temporary restraining order in the Circuit Court of Osceola County to prevent appellees, Walker Ranch General Partnership, et al. (Walker), from cutting any trees below the high water mark of Lake Hatchineha. The trial court initially enjoined the cutting of the trees which grow beneath a line corresponding to 54 feet mean sea level.
Following the issuance of this order, the Trustees filed an amended complaint for trespass, conversion, permanent injunctive relief, reclamation and civil theft. Walker filed a motion to dismiss for lack of subject matter jurisdiction, claiming that the lands involved were located in Polk, rather than Osceola County. At hearing, the issue revolved around the definition of "shore" found in the statutory description of each county's boundaries. Both section 7.49, Florida Statutes (1985), which describes Osceola County, and section 7.53, Florida Statutes (1985), which describes Polk County, contain references to "along the west and north shore of Lake Hatchineha."
The Trustees claim that the jurisdictional boundary between the counties is the upper extremity of the shore, or the ordinary high water line, a point they claim is located at 54.3 feet above mean sea level. The 54.3-foot figure comes from a study done by one Ernest Bishop in 1966, wherein he determined what he called the "geological high water mark," based on the area where the water made contact with the bank for at least nine percent of the time over twenty years. Walker claims that the boundary between the counties is the lower extremity of the shore, or the ordinary low water line, located at 48.5 feet above sea level. This figure was supplied by the testimony of Thomas Brooks, the superintendent of maintenance for the South Florida Water Management District, who testified that *155 since 1965 the lake has been artificially maintained at a maximum low and high water level of 48.5 feet and 52.5 feet, respectively. The trial court, apparently relying on precedent from King Solomon, determined that the proper boundary was at 50.5 feet above sea level, a point halfway between the regulated high and low water mark. In this case, however, unlike its biblical counterpart, both parties cried out, and both have appealed.
Both parties agree that Lake Hatchineha is located in Osceola County. See Clemons v. Chase, 120 Fla. 429, 162 So. 917 (1935).[1] Thus, the higher the boundary, the more area within Osceola County, since Polk County constitutes the uplands. Both parties also agree on the definition of what a "shore" is: "the ground between the ordinary high and low water marks." See State ex rel Ellis v. Gerbing, 56 Fla. 603, 47 So. 353 (1908); State v. Contemporary Land Sales, Inc., 400 So.2d 488 (Fla. 5th DCA 1981). The trial court also adopted this definition in its final order.
It is well established in Florida that private ownership does not extend below the ordinary high water mark of adjoining navigable waters.[2]State v. Contemporary Land Sales, Inc., supra. The Trustees claim the same mark should constitute the "shore" and thus establish the boundaries of Osceola and Polk Counties.
The ordinary high water line (OHWL) is described as "the point up to which the presence and action of the water is so continuous as to destroy the value of the land for agricultural purposes by preventing the growth of vegetation." Tilden v. Smith, 94 Fla. 502, 113 So. 708, 712 (1927). The high water mark on fresh water rivers is not the highest point to which the stream rises in times of freshets, but is the line which the river impresses upon the soil by covering it for sufficient periods to deprive it of vegetation and destroy its value for agriculture. Tilden, supra. In the instant case, it would be illogical to define the OHWL at 54.3 feet since the water has not reached that level since artificial control began over 20 years ago. This is not a situation where scientific examination of the bank is required to determine the high water mark, since the high water mark of 52.5 feet is reached and known by administrative control.
Walker contends that the low water mark is the proper boundary for the counties, relying primarily on a 1912 New York case, People v. Kyser, 78 Misc. 68, 138 N.Y.S. 801 (1912). In Kyser, the defendant was convicted of illegal fishing. A question arose as to which county the offense occurred in. The defendant contended that the fishing was done in a county other than the one in which he was convicted, since his fishing occurred in an area which was normally dry. The boundary between the counties ran "along the south shore of Oneida Lake." The court noted the law in New York which holds that lakefront owners are deemed to be the owners to the low water mark, and that a grant bounded by the shore of a fresh water river conveys the land to the water's edge at low water. From those cases, the court held that it was apparent that the shore of the lake was the edge of water at the low water mark. The court noted, however, that strictly speaking, the word "shore" would be applied to a strip of land fronting upon tidewater, between the high and low water marks. The judge held that the boundary should be permanent and not dependent on the shift of the level of the lake, and thus held it was the low water line.
Initially, it should be noted that, as pointed out, New York allows ownership of land *156 to the low water line, whereas Florida allows private ownership only to the high water mark.[3] Additionally, the fears of the fluctuating boundary expressed by the court in Kyser would not occur with the boundary fixed at the ordinary high water level, since the boundary would be permanent, not dependent upon where the water would be at times of drought or flood.
The only Florida case discussing the term "shore" as a boundary is Axline v. Shaw, 35 Fla. 305, 17 So. 411 (1895), in which the deed in question described the land in part as "to the shore of Orange Lake; thence northwesterly, with said shore of said lake,..." The court, in determining that no riparian rights existed under the deed, stated:
... One of the boundaries of her land is the shore of Orange Lake. In conveyancing, the word "shore," as applied to the sea and to tidal waters, has a definite and generally understood signification. It means that portion of land at the water's edge which is daily covered and daily left bare by the rising and falling of the tides. Gould, Waters, §§ 3, 28; Black, Law Dict. tit "Shore"; Storer v. Freeman, 6 Mass. 435 (text, 439). As applied to inland waters, so exact a definition cannot be given. The word generally has only application to large bodies of water, as lakes and large rivers, and means the land adjacent thereto. Webst. Int. Dict. If a boundary upon the "shore" of the lake is an equivalent term to a boundary upon the "lake" itself, or the "waters of the lake," then Mrs. Axline is a riparian proprietor; otherwise, she is not. We do not think the expressions are equivalent. Her land is bounded by the shore. The shore is land. The word "shore" is an antithetic term to that of "water." Their significations, instead of being synonymous, are the opposites of each other Therefore, the boundary is land, and not water. Her land being bounded by the shore of the lake, the idea is excluded that it is bounded by the lake itself or the waters thereof. The deed of Mrs. Axline does not even convey the shore. It conveys "to the shore." A deed conveys all within the boundaries, but does not convey the boundary itself... . There is a manifest difference between land bounded by the lake itself and bounded by the shore of the lake. Bounded by the navigable water, the lake, or the stream, the law extends the boundary to the edge of the channel. If bounded by the shore or bank, the land does not reach the water, but is limited to the upland. (Citations omitted.) Where a boundary is limited "to the bank of a stream," it necessarily excludes the stream itself. (Emphasis added.)
17 So. at 413.
As pointed out by the Trustees, the statute pertaining to the establishment of bulkhead lines, section 253.1221, Florida Statutes (1985), enacted in 1975, provides:
All bulkhead lines heretofore established pursuant to former s. 253.122 are hereby established at the line of mean high water or ordinary high water. There shall be no filling waterward of the line of mean high water or ordinary high water except upon compliance with this chapter.
This statute, when read in conjunction with the provisions of sections 7.49 and 7.53, describing the counties and providing for the establishment of bulkhead lines and their subsequent establishment as the shoreline,[4] implies an intent on the part of *157 the legislature to have the shore at the ordinary high water line. While no bulkhead has been established in the instant case, this intent can still be inferred and used to support the OHWL as the boundary.[5]
Walker's argument concerning the administrative and policing problems that would arise due to the exposure of the land if the low water mark were not the county boundary is rebutted by section 47.071, Florida Statutes (1985),[6] which provides for concurrent jurisdiction over navigable waters from shore to shore.
Under the general definition of "shore"  "the area between the high and low water mark"  the Osceola court, pursuant to section 47.071, would have full authority to adjudicate the present action up to the high water mark. This same result, of course, applies if the high water mark is the Osecola County boundary. Only if the low water mark constitutes the shore (hence boundary) would venue in Osceola County be improper.
The Trustees' argument that the determination of the boundary by reference to water levels determined by the South Florida Water Management District and Army Corps of Engineers violates the separation of powers doctrine of Article II, Section 3 of the Florida Constitution, is without merit. The trial court did not determine that the boundary line it found would be fluctuating with the water level; rather, it determined that 50.5 feet was the halfway mark between the controlled high water and low water marks. Presumably, the legislature knew about this level at the time it drew the boundaries in 1967, and thus the boundary was established by the legislature, not by the Corps or the South Florida Water Management District. Thus, there has been no violation of the separation of powers doctrine. Additionally, appellant failed to raise this point below and, thus, is precluded from doing so on appeal. See Hegeman-Harris Co., Inc. v. All State Pipe Supply Co., Inc., 400 So.2d 1245 (Fla. 5th DCA), review dismissed, 411 So.2d 380 (Fla. 1981).
An argument can be made in support of the trial court's finding based on the general surveying principle that the center line of the monument (here, the shore) is regarded as the boundary line. See 1 Fla. Jur.2d, Adjoining Landowners, § 19. While under this principle the trial court's findings would be correct, the legislative intent in establishing the bulkhead at the ordinary high water line, as well as the definition of "shore" found in Axline (that of land, and not water), requires a finding that the boundary as established by the legislature is actually the ordinary high water line of Lake Hatchineha.
We find that the trial court erred in determining the mid-point of the high and low water lines as the boundary between Polk and Osceola Counties, and reverse and remand for a determination that the ordinary high water line of 52.5 feet above mean sea level is the proper boundary separating the counties.
REVERSED and REMANDED.
UPCHURCH, C.J., and ORFINGER J., concur.
NOTES
[1] The description of the lands used in Clemons, and in effect until the revision resulting in the present statute in 1967, calls for the boundary "to Lake Cypress (now Hatchineha), and meandering said Lake Cypress... ."
[2] Much of the Trustees' brief discusses private versus public ownership of lands and the effect of a lowering of the water level on the lands' ownership. See State v. Contemporary Land Sales, Inc., 400 So.2d 488 (Fla. 5th DCA 1981). This is not relevant to a discussion of the issue in this appeal, which is solely the boundaries of the respective counties.
[3] In his work Florida Water Law 1980, Dean Maloney defines the ordinary low water mark as "the usual and common or ordinary stage of the river, when the volume of water is not increased by rains or freshets, nor diminished below such usual stage or volume by long continued drought, to extreme low water mark." Maloney, Florida Water Law 1980 at 750.
[4] Both sections 7.49 and 7.53 provide:

The shorelines of Lakes Kissimmee and Hatchineha shall be as physically present unless and until the Board of Trustees of the Internal Improvement Trust Fund shall establish bulkhead lines along the said lake shores; in which event, the said shorelines shall be the said bulkhead lines to the extent they are so established.
[5] If the Trustees had established a bulkhead, it seems that an argument could be made that the Trustees were improperly delegated a duty which solely belongs to the legislature.
[6] Section 47.071 provides:

47.071 Jurisdiction over navigable waters.  When the territorial jurisdiction of a court extends to one bank of any navigable water, such court has jurisdiction across such navigable water from shore to shore. If the territorial jurisdiction of different courts, whether of the same county or not, extends to the opposite bank of any navigable water, such courts have concurrent jurisdiction across said navigable water from shore to shore.