648 So.2d 155 (1994)
Roger MACNAMARA, Appellant,
v.
KISSIMMEE RIVER VALLEY SPORTSMANS' ASSOCIATION and Board of Trustees of the Internal Improvement Trust Fund, Appellees.
No. 93-02494.
District Court of Appeal of Florida, Second District.
October 14, 1994.
Rehearing Denied July 29, 1994.
*157 L.M. Buddy Blain of Blain & Cone, P.A., Tampa, for appellant.
David Guest, Tallahassee, for appellee Kissimmee River Valley Sportsmans' Ass'n.
Robert A. Butterworth, Atty. Gen., Jonathan A. Glogau, Asst. Atty. Gen., Tallahassee, and Parker D. Thomson of Thomson Muraro Razook & Hart, P.A., Sp. Asst. Atty. Gen., Miami, for appellee Bd. of Trustees of the Internal Improvement Trust Fund.
G. Stephen Parker and Joshua R. Kenyon, Atlanta, for amicus curiae Southeastern Legal Foundation.
Michael L. Rosen, Tallahassee, for amicus curiae Fla. Legal Foundation, Inc.
PER CURIAM.
We affirm the trial court in all respects and adopt the following final order of the trial judge.
"This action concerns the legality of a barbed wire fence on a spoil island in Lake Hatchineha at the entrance to the Kissimmee River. The Plaintiff Sportsmans' Association sued Roger Macnamara, a riparian owner, questioning the authority by which Macnamara exercises the right to fence off a spoil island in the Lake and a shallow, vegetated part of the Lake that lies between the spoil island and the shore. The Plaintiff Association's amended complaint is filed in the capacity of relator for the State of Florida, relying on Section 253.12(1), Florida Statutes and Article X, Section 11 of the Florida Constitution, which holds that spoil islands and navigable waters are and remain public lands held by the state in trust for public use and enjoyment.
"After the trial, the Board of Trustees of the Internal Improvement Fund moved to intervene, adopting the evidence and argument submitted by the Plaintiff. The court conducted a hearing on the question on May 3, 1993, at which hearing counsel for the Trustees explained that they sought to be fully bound by this Court's adjudication so as to avoid any risk of having to retry the case and so that they could participate fully in any *158 resulting appeal. Given these arguments and the Board of Trustees' status as the title holder of spoil islands and of river and lake beds, the Court grants the motion to intervene so that the Trustees shall have all the rights of a full party.
"Prior to the late 1960's, this area and other nearby shallow areas of Lake Hatchineha were vegetated with marsh vegetation and a few cypress trees. The areas at the base of the cypress trees provided excellent fishing, and during the high water season fishermen would navigate small fishing boats over the entire area in controversy.
"When the Central and Southern Florida Flood Control Project channelized the Kissimmee River in the late 1960's, a canal designated `C-37' was dredged between lakes Hatchineha and Kissimmee, and the spoil from the project was placed on the west side of the canal where it entered Lake Hatchineha. The spoil island at issue is approximately 150 wide and runs approximately three thousand feet to the northwest. Some locations on the spoil island rise as much as twenty feet above the water. After the creation of the spoil island, it overgrew with trees and became a favorite camping place for members of the Plaintiff Association and other members of the public. This controversy arose when the Defendant placed a barbed wire fence around the island in 1991.

"DEFENDANT'S WATERFRONT LOTS
"There is no dispute about whether Macnamara has title to the government lots fronting on Lake Hatchineha. The question for this court is whether Macnamara has fenced an area of the Lake lying waterward of the boundary of those lots. The Defendant derives his ownership from a deed from the Trustees of the Internal Improvement Fund to Ingram Fletcher in 1876. That deed included government lot 2 and the north half of lots 3 and 4 in section 2, Township 29 South, Range 29 East, as well as lot 4 in section one of that township. All of these government lots border the west side of Lake Hatchineha at the entrance to the Kissimmee River.
"The eastward lines of those lots were surveyed by federal public lands surveyors in the mid-1800's who plotted "meander lines." Meander lines are a series of straight line segments intended to approximate the sinuosities of the shoreline. See David G. Guest, The Ordinary High Water Boundary on Freshwater Lakes and Streams: Origin, Theory, and Constitutional Restrictions, 6 J.Land Use & Envtl.L. 205, 222-23, n. 70. (1991). However, until the 1880's, the instructions to the surveyors did not state whether the meander line was to be at low water, high water, or any particular place in between. Id. In 1881, the instructions were amended to require the meander lines to follow the low water line, and thirteen years later were amended to require the lines to be placed at the high water mark. Id. Since then, the manual of instructions to federal surveyors has contained hopelessly garbled instructions. Id.
"Although all of the area in controversy lies waterward of the meander lines on the east side of the government lots, long-standing case law holds that the water boundary of government lots is the natural monument  the true line of ordinary high water  rather than the meander line plotted by the public lands surveyors. For example, in Calder v. Hillsboro Land Co., 122 So.2d 445, 457-60 (Fla. 2nd DCA 1960), the public lands survey meander line enclosed a lot of 22.55 acres, while extension of the shore-perpendicular lot lines to the true ordinary high water line resulted in a lot of 54.85 acres. Id. at 459-60. Similarly, in McDowell v. Trustees of the Internal Improvement Fund, 90 So.2d 715, 717 (Fla. 1956), a riparian owner filled a portion of the lake bed between the ordinary high water line and the meander line plotted in the public lands survey. The latter line ran two to three hundred feet out into the waters of the Lake. The court held that the boundary was the natural monument  the ordinary high water line  and that the location of the meander line did not serve to convey any interest in land waterward of that natural monument. Because acreage estimates are simply calculated from the area enclosed by the meander line, acreage calculations do not serve to identify the boundary any more than do the meander lines themselves. Calder, 122 So.2d at 459-60. For that reason, this court must *159 disregard the meander line from the public lands survey and determine whether the fence at issue lies waterward or landward of the ordinary high water boundary of Lake Hatchineha.

"THE ORDINARY HIGH WATER BOUNDARY
"The ordinary high water boundary on fresh waters is the ordinary or normal reach of water during the high water season. Its origin derives from the analogy to the cycle of high and low water that forms the basis for the tidal boundary. The tidal boundary is the normal reach of water during the high water phase of each day; the freshwater boundary is the normal reach of water during the high water season of each year. See Guest, supra at 206-209.
"The matter of principles and techniques for locating the boundary between navigable waters and private uplands is strictly one of Florida law. Case law from other states is inapplicable because there is a very wide variety of different formulations for water boundaries from one state to another. Shively v. Bowlby, 152 U.S. 1, 26 [14 S.Ct. 548, 557, 38 L.Ed. 331] (1894). Federal decisions have no bearing whatsoever on the legal ordinary high water boundary under Florida law. Oregon v. Corvalis [Corvallis] Sand & Gravel Co, 429 U.S. 363, 370-71 [97 S.Ct. 582, 586-87, 50 L.Ed.2d 550] (1977).
"Florida law of ordinary high water was established in two cases decided by the Florida Supreme Court. Tilden v. Smith, 94 Fla. 502, 113 So. 708 (1927); Martin v. Busch, 93 Fla. 535, 112 So. 274 (1927). Tilden refers to the analogy to tidal waters and then describes two shoreline profiles that occur on Florida freshwater lakes and streams: steep banked and flat banked. In the case of steep banked shorelines, the line is the place where the continued presence and action of water has wrested vegetation and impressed a line of demarcation on the bank where there is a clear change in the character of the soil and vegetation. Tilden, 94 Fla. at 512-13, 113 So. at 712.
"Flat banked waterbodies lack a clear line of demarcation, and Tilden places the boundary for those waterbodies at the point where the presence of water prevents the cultivation of an ordinary agricultural crop. Id. In streams and lakes with the flat banked profile, the near-shore shallows often contain marsh vegetation and aquatic trees. Those vegetated near-shore areas can be very extensive.
"The decision in Martin v. Busch, 93 Fla. 535, 112 So. 274 (1927) addressed just such an area along the shore of Lake Okeechobee. As portrayed in the appellee's brief in the Supreme Court record in that case, the area at issue was a large shallow cove of Lake Okeechobee with a sand bar at the edge of the cove which fronted the open waters of the Lake. The waters of the cove were shallow and overgrown with a large stand of marsh vegetation, so that the area could not be navigated. In deciding that the disputed area was in public ownership as part of Lake Okeechobee, the court explained that public ownership includes all parts of a navigable lake `whether or not the water is navigable in all its parts towards the outside lines or elsewhere.' 112 So. at 283.
"On the question of locating the ordinary high water boundary on a waterbody with a flat banked shoreline profile, the court found that:
"[i]n flat territory or because of peculiar conditions, there may be little if any shore to navigable waters, or the elevation may be slight and the water at the outer edges may be shallow and affected by vegetable growth or other conditions, and the line of ordinary high water mark may be difficult of accurate ascertainment; but, when the duty of determining the line of high water mark is imposed or assumed, the best evidence attainable and the best methods available should be utilized in determining that establishing the line of true ordinary high water mark, whether it is done by general or special meandering or by particular surveys of adjacent land. Marks upon the ground or upon local objects that are more or less permanent may be considered in connection with competent testimony and other evidence in determining the true line of ordinary high water mark.
*160 "Id. at 283. The court's method of locating the water boundary on flat, vegetated shorelines calls for using the best evidence and methods available, including identifying the elevation of ordinary high water by reference to water marks on the ground or local objects. This latter method requires corroborative testimony or other competent evidence to support the conclusion that the water marks at issue are in fact ordinary high water marks.
"The question of the elevation of the ordinary high water boundary of Lake Hatchineha has previously been adjudicated. In Trustees [of the Internal Improvement Trust Fund] v. Walker Ranch, 496 So.2d 153, 157 (Fla. 5th DCA 1986), the court found that the upper edge of the shore lay at an elevation of 52.5 feet above mean sea level (N.G.V.D.). The term `shore' was explained by that court as meaning the zone between ordinary low and ordinary high water. Id. On remand, the trial court in Walker Ranch held by way of a partial summary judgment order that the legal boundary was 52.5 feet, and held that the Defendant was liable for cutting trees within any part of the Lake that lay below the 52.5 elevation. However, the court held that the Trustees do not own swamps and lowlands connected to the Lake but which are not part of the lake, even if parts of those swamps and lowlands fall below the 52.5 foot elevation. Subsequently, the Trustees admitted that no trees had been cut below the 52.5 foot elevation in the Lake, and a final order was entered in favor of Walker Ranch. The decisions in Walker Ranch establish that the boundary of Lake Hatchineha is 52.5 feet N.G.V.D., meaning that any part of the lake below that elevation constitutes sovereignty lands available for public use and enjoyment, absent a right, title or privilege granted by the state that would limit or foreclose those public use rights.
"This case clearly illustrates the rationale for the rule in Calder v. Hillsborough Land Co., 122 So.2d 445, 457-60 (Fla.2d DCA 1960)[,] and McDowell v. Trustees of the Internal Improvement Fund, 90 So.2d 715, 717 (Fla. 1956)[,] that the true water boundary is the ordinary high water line rather than the meander line. The government lots sold to Fletcher in 1875 are plotted in Plaintiff's exhibit 5B along with the 52.5 foot contour line which forms the boundary of the Lake. In government lot 2 in section 2, the meander line is landward of the true ordinary high water line, so that the shore-perpendicular lines in the government lots must be extended down to the ordinary high water line. Although extending those lot lines down to the 52.5 elevation (the established boundary of the Lake) results in an approximate doubling of the acreage in government lot 2 of section 2, the same process yields the opposite result in government lot 4 of section 1. In the latter case, the 52.5 foot contour runs substantially landward of the meander line, leaving only a fraction of that lot landward of the ordinary high water boundary.
"The method used in Florida law for identifying the ordinary high water boundary differs from that used by the federal government in plotting the limit of the federal navigation servitude. Where Florida law excludes lands dry enough to cultivate an ordinary agricultural crop while including shallow vegetated areas that are part of the lake or river, federal law apparently excludes from the navigation servitude any shallow vegetated area, or area susceptible of livestock foraging. United States v. Harrell, 926 F.2d 1036, 1042 (11th Cir.1991). Without attempting to explore the mysteries of the federal navigation servitude, it suffices to say that this federal test would produce absurd results if it were applied to locate the legal boundary on Florida flatland lakes and rivers. Those absurd results are well-illustrated by Plaintiff's exhibit 6M, which depicts a cow grazing on vegetation in waist-deep water in an area that appears to be at least a hundred yards from the shore of Lake Hatchineha.

"FACTS OF THE CASE
"During the 1800's and early 1900's, commercial steamboat traffic coursed the waters of Lake Hatchineha and traveled down the Kissimmee River. The Shell Hammock boat landing lies just south of the area in controversy, and the pilings of the dock that served steamboats at that landing remain clearly visible. Lake Hatchineha is a navigable *161 lake, and the Kissimmee is a navigable river.
"The area in controversy is located on the west side of Lake Hatchineha at the entrance to the Kissimmee River. As depicted in the 1958 aerial photograph, the disputed area in the triangular vegetated zone west of the open water at the southern extremity of the lake, and east of a large citrus grove bordered by a stand of trees. The base of the triangular area is to the south, and is approximately 700 feet wide, and extends approximately 2,000 feet to the north northwest. Comparison of the 1958 aerial photo with a map depicting the 52.5 foot contour line of the lake shore shows that in this location, the lake shore runs just east of and parallel to the eastern boundary of a large citrus grove. Prior to the dredging of C-37 and the creation of the spoil island adjacent to the canal, the triangular area in controversy was vegetated lake bottom.
"Although the aerial photos do not depict open water in the area in controversy, this area is like the vegetated shallows of Lake Okeechobee that gave rise to the case of Martin v. Busch, 93 Fla. 535, 112 So. 274 (1927), discussed above. From at least the 1940's through to when the C-37 canal was dredged in the 1960's recreational fishermen would run 12 to 16 foot fishing boats powered by small outboard motors throughout the entire triangular area in controversy during the high water season. A line of cypress trees stood on the edge of the open water along the east side of the triangle. These trees grew on a sand bar that ran north on the edge of the open water. Although the sandbar was always submerged, boaters who didn't know of the sand bar would get stuck on it with their kicker boats. The area around the base of these cypress trees as well as the area west of them to the shore of the lake were favorite fishing sites for sport fishermen. Recent photos taken on the site enclosed by the fence in dispute show water depths of two to three feet among cypress trees, other aquatic trees, and marsh vegetation. These photos are typical depictions of the entire area in controversy other than the spoil island.
"Although the most recent aerial photographs no longer show an open water channel on the west side of the triangle, witnesses described a channel in this location which was navigable by small kicker boats for most of the year. An examination of the 1958 aerial photograph reveals an approximately 500 foot segment of open water channel running north from the west side of the base of the triangle. Recent photographs of state surveyors in thigh to waist deep water at points on this westerly channel confirm water depths sufficient to permit the kind of navigation described by these witnesses. These photos were taken when the water surface was approximately 51.3 in elevation, or about 1.2 feet lower than ordinary high water.
"The indicators described in controlling case law locate the ordinary high water line at the same elevation as found in the prior adjudication in Walker Ranch. The dock pilings of the old Shell Hammock steamboat landing bear clear ordinary high water marks at the 52.5 foot elevation. The agricultural crop test can hardly be more clearly illustrated than by examining the aerial photos from 1941 through 1971. A comparison of those aerial photos with the site map depicting the 52.5 contour along the shore shows that the waterward side of that orange grove closely follows the sinuosity of the shoreline just landward of the 52.5 foot contour of the shore. In none of these ten aerial photos over the past fifty years is there any suggestion of any agricultural crop being cultivated waterward of the 52.5 foot contour of the Lake.
"In the mid 1960's, the C-37 canal was dredged, and the spoil from that canal was placed at the edge of the open water. The 1971 aerial photo, which is the first photo subsequent to the construction of C-37, depicts a 150 foot wide spoil island approximately 3,500 feet long along the open water side of the triangular zone in dispute. Local fishermen and others began to camp on the spoil island, and the island became one of the most popular camping sites in the Lake area. This took place because spoil islands are public property available for public use. § 253.12, Fla. Stat.
*162 "Although the sandbar and possibly other portions of the area in controversy may have been exposed during some dry periods, the entire area was submerged at normal and high water stages. For that reason, the entire area in controversy must be considered vegetated lake bottom, and the spoil island is retained in public ownership pursuant to Section 253.12(1), Florida Statutes.

"TRUSTEES' LEASES AND SALES OF LAKE BOTTOMS
"It is well established that private riparian owners can exclude the public from portions of lakes that have been the subject of sovereignty land leases or sales. For example, in Baker v. Jones ex rel. State, 87 So.2d 497 (Fla. 1956), the Trustees leased a non-navigable arm of a navigable lake to the riparian owner so that he could build a dam and convert the area into an artificial lake. The court held that the lease operated to exclude the public because that part of the lake had not been navigable in its ordinary and natural condition (prior to the dam).
"Like the riparian owner in Baker, the riparian owners directly across the lake from Macnamara also negotiated with the Trustees to obtain legal rights to the lake bottoms adjacent to their land. In 1963, the Zipprers initiated negotiations to acquire the area of lake bottom between the ordinary high water boundary of their waterfront land and the C-37 canal. Those negotiations culminated in a purchase of sovereignty lands from the Trustees in 1964. That parcel of land is essentially the same as the area in controversy in this case before the spoil island was created.

"MACNAMARA'S LEGAL AUTHORITY TO FENCE THE LAKE BOTTOM AND SPOIL ISLAND
"The Defendant asserts a variety of sources for legal authority to fence the spoil island and vegetated lake bottom. Although Macnamara obtained a permit from the Corps of Engineers, the permit states on its face that it does not obviate the need to obtain authorization from the State. The Defendant contends that authorization for the fence at issue was obtained by way of a telephone conversation with a state DNR employee. However, a DNR official charged with responsibility in this area testified that all permits must be in writing, that no written record exists, that the policy of the agency is not to issue oral permits, and that he had investigated and had found no employee at DNR who had given telephone authorization for the fence.
"Macnamara also claims authorization from the State Department of Environmental Regulation ("DER") and the Water Management District (the `District') for a road to and fence on the spoil island. No fence permit or authorization was submitted in evidence. Although the District did construct a road to the spoil island, the DER ordered and obtained the removal of the road shortly after it was constructed.
"The Defendant also claims ownership to the area in controversy because he conveyed a right of way easement to the District for the C-37 right of way. However, the Trustees of the Internal Improvement Fund also gave the District a right-of-way easement over the identical area of lake bottom. The fact that the District obtained a right of way from the riparian owner over lake bottoms simply reflects the standard practice of obtaining easements from every person who could possibly have any interest in the property. That standard practice appears in the District's letter explaining the Zipprer transaction immediately across the lake from Macnamara. The letter explains that an easement over lake bottoms was being obtained from both Zipprer and the Trustees because `in the event there is any dispute between Mr. Zipprer and the Trustees as to ownership, the District would be covered both ways.' In any event, a conveyance by a grantor to a grantee cannot legally create rights in the grantor.

"EQUITABLE ESTOPPEL
"The Defendant also relies on equitable estoppel to justify its right to fence the lake bottoms and spoil island. For this claim, the Defendant relies on the various transactions described above as well as on the alleged payment of ad valorem taxes for the area in dispute. Although equitable estoppel can apply against the state in its *163 sovereign capacity, such claims can be pursued only in rare instances where there are exceptional circumstances. Calusa Golf, Inc. v. Dade County, 420 426 So.2d 1165, 1167 (Fla. 3rd DCA 1983). Among the elements that must be proven is a positive act by an authorized official, upon which reliance is based. Jefferson National Bank v. Dade County, 271 So.2d 207, 214 (Fla. 3rd DCA 1972). Under no circumstance, can the state be estopped by the unauthorized acts or representations of its officers. Greenhut [Constr. Co.] v. Knott, [Inc.], 247 So.2d 517, 524 (Fla. 1st DCA 1971). None of the alleged authorizations relied on by the Defendant constitute an act or statement by a state officer authorized to permit private fencing of public lake bottoms.
"Nor is the possible payment of taxes sufficient to justify equitable estoppel. The testimony from a representative of the tax assessor's office shows that ad valorem taxes were not imposed on the area in controversy. Despite long-established caselaw holding that meander lines are not boundaries, the tax office treats them as such; this practice confirms that boundary location on water bottoms falls outside the expertise of the tax assessor. Even if taxes had been paid, such payment cannot form the basis for equitable estoppel because it is the Trustees of the Internal Improvement Fund rather than the tax assessor who are authorized to speak for the state on the subject of boundaries on navigable lake bottoms. § 253.12(1), Fla. Stat. If a taxing error has taken place, the remedy is a tax refund rather than conversion of lake bottoms to private ownership.

"STANDING TO ASSERT THE RIGHT TO USE NAVIGABLE LAKES AND SPOIL ISLANDS
"The amended petition in this action states that the Plaintiff is suing as relator for the State of Florida, questioning the legal authority of Macnamara to fence off part of a navigable lake and spoil island lying therein. The Defendant has moved to dismiss for want of subject matter jurisdiction on the ground that the Plaintiff is without standing to sue. As grounds for this motion, the Defendant alleges that the Plaintiff is not a state agency, an adjacent owner or a person with special injury, and that Trustees' deeds of submerged lands cannot be collaterally attacked in suits between private parties.
"Counsel for the Defendant stipulated on the record that agreed he [sic] to all the provisions of a proposed pre-trial stipulation, paragraph 3 of which reads:
"Plaintiff may assert the right to use public lands subject to any limitations set out in Department of Natural Resources rules, however, the Defendant will not stipulate that Plaintiff has standing to challenge the Macnamara's title.
"The amended petition states that the Plaintiff sues as relator for the State of Florida, questioning the authority by which the Defendant fences a part of Lake Hatchineha and a spoil island lying therein. This manner of raising the issue of public access to parts of navigable lakes was accepted by the Florida Supreme Court in the case of Baker v. Johnny Jones ex Rel. State of Florida, 87 So.2d 497 (Fla. 1956).
"This court takes judicial notice of two items from the Supreme Court's case file in Baker v. State in order to assist in interpreting that decision. Those items are a summary of the issue raised in the certiorari petition concerning standing, and the order of the Supreme Court denying certiorari. In Baker, Johnny Jones sued for relief from denial of public access to an arm of a navigable lake that had been leased to Baker (the riparian owner) by the Trustees of the Internal Improvement Fund. Baker, the Defendant, had moved to dismiss the complaint, inter alia, for want of standing, and filed a certiorari petition to the Supreme Court raising that issue after the trial court denied the motion to dismiss. The court's summary from the Supreme Court files explains that the issue was whether Jones' petition ex rel. the State of Florida, seeking a decree that he had the right to use the disputed part of the lake, stated a justiciable claim. Baker's petition for certiorari was denied. As explained above, the Baker court ultimately ruled that the Trustees' lease was valid and sufficient to allow Baker to exclude the public because the arm of the lake at issue had been rendered artificially navigable as a result of a dam. *164 Baker v. Johnny Jones ex Rel. State of Florida, 87 So.2d 497 (Fla. 1956).
"The Defendant's stipulation that the Plaintiff may assert the right to use public land comports with the Supreme Court's decision in Baker that Johnny Jones could sue on relation of the State. If Plaintiff can assert the right to use and enjoy public lands, it must be able to show that public lands have been fenced off.
"The Defendant did not stipulate that the Plaintiff's [sic] could attack the Defendant's title, and relies on Pembroke v. Peninsular Terminal Co., [108 Fla. 46], 146 So. 249, 259 (1933)[,] and similar cases for the proposition that Trustees' submerged lands conveyances may not be collaterally attacked. In Pembroke, the Trustees had conveyed a tract of sovereignty lands in the bed of Biscayne Bay and a defendant in a foreclosure action contended that title had failed because the Trustees had wrongfully conveyed the submerged tract. Id. at 250. Here, the Trustees have not conveyed or granted any rights in any part of the lake bottom or spoil island in dispute. Other cases cited by the Defendant hold that parties without special injury may not sue the government to question the wisdom of decisions disposing of or managing public properties. E.g., Doherty v. Joachim, [146 Fla. 50], 200 So. 238, 239 (1941) (government decision to abandon public walkway); Smith v. Bolte, 171 172 So.2d 624, Ashe v. City of Boca Raton, 133 So.2d 122, 123 (Fla. 2nd DCA 1961) (city's conveyance of land to State Board of Education). Plaintiff in the instant case does not challenge any government decision to grant rights or privileges to Macnamara, but instead asserts that no such rights have been granted.
"At its core, this controversy is a challenge by the Plaintiff as relator on behalf of the State questioning the legal authority by which Macnamara takes an action on sovereignty lands of the State that requires the granting of a license, right, title[,] or privilege from the State. In State ex rel. Ellis v. Gerbing, 56 Fla. 603, 47 So. 353, 355 (Fla. 1908), an action was filed to question by what authority the riparian land owner claimed the exclusive right to harvest oysters in the bed of the river fronting his land. The court held that:
"the state may grant reasonable and limited rights and privileges to individuals to erect wharves ... or the state may grant reasonable and limited privileges for planting and propagating oysters or shellfish on lands covered by waters of navigable streams;
"Id. at 356. Finding the absence of a grant to the riparian owner in the case, the court held:
"[a]s the respondent shows no legal claim to exclusive rights on lands under the navigable waters of the river, including those lands between ordinary or normal high and low water marks, the referee should have entered a judgment against the respondent as to such lands below high-water mark in which he claims exclusive privileges.
"Id. at 357-58. The Plaintiff in this case similarly questions the authority of Macnamara to exercise the exclusive right to use the waters and spoil island fronting his riparian lands, and seeks the same relief.
"Although the action in Gerbing was brought by the Attorney General, actions in the nature of quo warranto to question the authority for the exercise of rights, privileges[,] and powers derived from the state can be brought by any person. In Martinez v. Martinez, 545 So.2d 1338 (Fla. 1989), the Governor asserted that a member of the legislature lacked standing to question the authority of the Governor to call a special session of the legislature. The court takes judicial notice of the Governor's brief from the Supreme Court records as an aid in interpreting the Martinez decision, and that brief shows that the Governor had argued that only the Attorney General or persons suffering special injury could bring quo warranto actions. The Court rejected that argument, holding that:
"[i]n quo warranto proceedings seeking the enforcement of a public right, the people are the real party to the action and the person bringing suit `need not show that he has any real or personal interest in it.' State ex rel. Pooser v. Wester, 126 Fla. 49, *165 53, 170 So. 736, 737 (1936). However, in the instant case, as a member of the legislature being called into special sessions, Representative Martinez is directly affected by the governor's action. We hold, therefore, that he has standing to challenge the governor's power to call a special session.
"Id. at 739 (footnote omitted). In the instant case, a substantial number of the Association members use the spoil island for fishing, swimming[,] and camping. The juxtaposition of deep water and high land in a lake with shallow vegetated margins makes the spoil island a unique and highly desirable site for public recreation. For these reasons, the Association is directly affected by the exclusion of the public from this area, and has standing to bring this action.

"CONCLUSION
"The evidence presented at trial shows that the Defendant has fenced a part of Lake Hatchineha and a spoil island lying therein. This claim of exclusive rights and privileges can only be derived from the State, and the Plaintiff has shown that the State has not conferred upon the Defendant any exclusive rights or privileges to the area in dispute.
"It is therefore ORDERED and ADJUDGED that Defendant shall remove the fence enclosing the spoil island and part of Lake Hatchineha, and to permanently cease and desist from attempting to bar the public from using any part of the spoil island or any area waterward of where the 52.5 foot elevation intersects the shore of the Lake on the west side of the spoil island adjacent to canal C-37. The Plaintiff is entitled to recover costs although defense of this action was fully justified. See section 57.041(1), Florida Statutes and Oriental Imports, Inc. v. Alilin, 559 So.2d 442 (Fla. 5th DCA 1990).
"DONE and ORDERED this 24[th] day of May, 1993 at Bartow, Polk County, Florida."
Affirmed.
FRANK, C.J., and HALL and THREADGILL, JJ., concur.