In re JET 1 CENTER, INC., Debtor.

Jet 1 Center, Inc., a Florida Corporation, Plaintiff/Counter-defendant,

v.

City of Naples Airport Authority, Defendant/Counter-plaintiff And Third Party Plaintiff,

v.

Jet 1 Center, Inc., et al., Counter-defendant and Third Party Defendants.

Bankruptcy No. 9:03–bk–26514–ALP.
Adversary No. 04–110.

United States Bankruptcy Court,
M.D. Florida,
Ft. Myers Division.

Aug. 26, 2005.
Order denying Stay Pending
Appeal Oct. 26, 2005.

Lori V. Vaughan, Mark J. Wolfson, Foley & Lardner, Tampa, FL, for Jet 1 Center, Inc., a Florida Corporation/Counterdefendant and Third Party Defendants.

David M. Hayes, Bond, Schoeneck & King, PLLC, Syracuse, NY, James D. Dati, Bond, Schoeneck & King, PA, Naples, FL, Louis X. Amato, Louis X. Amato, PA, Frostproof, FL, Peter J. Iacono, Naples, FL, for City of Naples Airport Authority, Counterplaintiff and Third Party Plaintiff, Counter–Claimant.

Alberto A. Macia, Budd Bennett & Macia, Naples, FL, for Beasley Aircraft Leasing, LLC, 3rd Party Defendant.

T. Patrick Tinker, Office of the U.S. Trustee, Tampa, FL, for U.S. Trustee—FTM, U.S. Trustee.

### FINDING OF FACTS, CONCLUSION OF LAW AND MEMORANDUM OPINION IN RE: IN THE CLAIM ASSERTED IN THE ABOVE-CAPTIONED ADVERSARY PROCEEDING IN COUNT I, LEASE AGREEMENTS AND COUNT VII, PROMISSORY ESTOPPEL (Doc. No. 66) and ORDER ON MOTION FOR SUMMARY JUDGMENT IN OPPOSITION TO DEBTOR'S MOTION TO ASSUME NONRESIDENTIAL LEASES BY CITY OF NAPLES AIRPORT AUTHORITY (Doc. No. 137) and DEBTOR'S CROSSCLAIM MOTION FOR SUMMARY JUDGEMENT ON MOTION FOR AN ORDER AUTHORIZING ASSUMPTION OF UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY WITH CITY OF NAPLES AIRPORT AUTHORITY (Doc. No. 321)

ALEXANDER L. PASKAY,
Bankruptcy Judge.

THE MATTERS under consideration in the above-captioned adversary proceeding of Jet 1 Center, Inc. (the "Debtor") and the City of Naples Airport Authority (the "Airport Authority") are Count 1 and VIII, the two remaining counts of a ten-count Complaint filed by the Debtor against the Airport Authority. In Count I the Debtor seeks a determination that its Leases were not effectively terminated by the Airport Authority prior to the date the Debtor filed its Petition for Relief under Chapter 11 of the Code.

The Debtor's claim in Count VIII is based on the allegation that the Debtor, in reliance on the Airport Authority's inaction to enforce its rights under the Leases involving the Debtor, expended substantial sums in establishing the facilities for its Fixed Based Operations at the Naples Airport.

In addition, the Debtor filed a Motion for an Order Authorizing Assumption of Unexpired Leases of Nonresidential Real Property with the City of Naples Airport Authority.[1] The Debtor in its Motion sought to assume the very same Leases which are involved in the claim asserted in Count I of the Complaint. The parties agreed that the relief sought by the Debtor in its Motion should be consolidated and considered together with the consideration of the claim asserted in Count I. The Airport Authority filed an Objection to the Debtor's Motion to Assume Nonresidential Leases[2] and filed a Motion for Summary Judgment[3] contending that in this contested matter there are no genuine issues of material fact. Based on the same, it is entitled, as a matter of law, to a declaration that the Debtor cannot assume the Leases in question because the Leases were effectively terminated prior to the

---

1. General Case No. 03–26514, Docket No. 40.

2. General Case No. 03–26514, Docket No. 65.

3. General Case No. 03–26514, Docket No. 137.

commencement of the Chapter 11 case of the Debtor. The Debtor also filed its Motion for Summary Judgment[4] contending as did the Airport Authority, that there are no genuine issues of material fact but, contrary to the Airport Authority's contention, the Leases were not terminated, they remained the properties of the Debtor's estate and are assumable pursuant to Section 365(b) of the Bankruptcy Code. A brief recap of the relevant facts and procedural history should be helpful. The facts are as follows.

The Airport Authority has operated and maintained the Naples Municipal Airport since 1969 pursuant to a ninety-nine year lease from the City of Naples. The Airport Authority's operations consist of selling aviation and jet fuel to transient aircraft landing at the Naples Airport. In addition to selling aviation and jet fuel, the Airport Authority provides additional services such as land rental, lease of office space, T-hangers, tie-down, lavatory, and concession fees.

The Debtor is a Fixed Base Operator ("FBO") who is engaged in aviation related businesses on the northwest quadrant of the property owed by the Airport Authority. The Debtor claims occupancy of the lands at the Airport Authority pursuant to the two non-residential leases.

On November 1, 1995, the Debtor and the Airport Authority entered into a Leasehold Agreement[5] (the "First Lease") which provided the Debtor with a thirty-year ground lease for certain real property located at the City of Naples Airport. After executing the First Lease, the Debtor began construction of a large airport hanger, offices, and ramp spaces. On August 1, 1997, the Airport Authority and the Debtor entered into a second Leasehold Agreement (the "Second Lease") for additional property at the City of Naples Airport.[6] On November 19, 1998, the Debtor and the Airport Authority entered into an Amendment to the Leasehold Agreement (collectively referred to as the Amended Leasehold Agreement), which amended the Second Lease.[7] The First Lease, Second Lease and the Amended Leasehold Agreement shall be referred to herein as the Leases and/or Lease Agreements.

## PRE-LITIGATION HISTORY

It is without dispute that prior to the execution of the Lease Agreements between the Debtor and the Airport Authority, Scott Phillips and Kevin Stoneburner, who are the principals of the Debtor, met with Theodore D. Soliday, the Executive Director of the Airport Authority, to discuss the establishment of an FBO at the Naples Airport. Both the Debtor and the Airport Authority agree that several meetings were held during 1994 and 1995 and the parties discussed various issues with respect to the Lease and the Debtor's intentions to build the FBO at the Naples Airport, and the Debtor's interest in developing a facility where there would be fueling allowed by the Debtor.

The Debtor contends that it was made clear to the Airport Authority that it anticipated spending approximately $2,000,000—$3,000,000 to develop the FBO at the northwest quadrant of the Naples Airport. The Debtor further contends that Mr. Soliday clearly understood that the Debtor was only willing to invest the above-mentioned sum of money at the Naples Airport if they would have the ability to provide

---

4. General Case No. 03–26514, Docket No. 321.

5. Plaintiff's Exhibit No. 1.

6. Plaintiff's Exhibit No. 2.

7. Plaintiff's Exhibit No. 3.

fuel to their own airplanes, long-term tenants, and also the possibility of fueling transient airplanes in the future. It is the Debtor's contention prior to the execution of the Lease Agreements that it was "our understanding that we would be able—if we built this facility, we would be able to install our own fuel farm and service long-term tenants with a lease of six months or more. We would be able to fuel them with our gas, our trucks, our people and our personnel, and we would not have to rely on the Airport Authority's fuel inventory or personnel to provide that fuel." [8]

The Airport Authority contends that Mr. Phillips did not express to them the importance of the right to fuel in order to build the FBO at the Naples Airport. The Airport Authority claims that they provided Mr. Phillips with a "package that we would give every person who wanted to establish an operation at the airport," [9] and they discussed fueling procedures at the airport and the ability to self-fuel at the Naples Airport. The Airport Authority agrees that the Debtor did imply that he wanted the ability to participate in self-fueling of his own aircraft, and eventually, also fuel long-term subtenants.

The Airport Authority contends that the Debtor understood prior to signing the lease that it had the ability to self-fuel its own aircraft and also the long-term subtenants' aircraft, as long as the Debtor submitted a request for the permit to the Airport Authority. Furthermore, the Airport Authority "would have to extend that right because the permit itself did not provide that right," [10] to the Debtor or any

FBO to fuel its long-term subtenants. However, it is clear from the record that the Debtor did not receive their fueling permit to self-fuel its own aircraft until approximately fifteen months after the initial lease was executed on November 1, 1995.

It is important to note at this point that the Debtor was represented by counsel prior to the execution of the First Lease. Furthermore, the Debtor had an opportunity to review the lease prior to its execution on November 1, 1995. Nonetheless the Debtor, as stated above, signed the lease, which specifically indicated that the "[t]enant agrees that the Leased Premises shall be used for aircraft storage, the construction of hanger and associated facilities to park and store aircraft, as well as the usage of office space provided by the Tenant consistent with the terms and conditions of this Agreement. No other use or occupancy is authorized." [11] The Lease Agreement further provides that, "nothing in this paragraph shall be construed to allow Tenant to conduct: (1) any aeronautical activities other than those described above; or (2) any activities that violate or depart from the provisions and intent of the Authority Rules and Regulations (See Paragraph 10 herein)." [12]

Although it is the Debtor's contention that the Airport Authority assured them that they would be able to self-fuel, the Lease agreements specifically indicate that, "[f]lammable or explosive liquids or materials shall not be allowed, kept or used on the Leased Premises except that

**8.** *Jet 1 Center, Inc. v. City of Naples Airport Authority v. Jet 1 Center, Inc., et. al.* Adv. Pro. No. 04–110. Tr. Trans. Vol. I. page 30, line 5. Tr. Trans., Vol. I and Vol. II is in reference to Final Evidentiary Hearing transcript of May 4, 2005.

**9.** Tr. Trans. Vol. I, p. 117, line 19.

**10.** Tr. Trans. Vol. I. p. 124, line 21.

**11.** Defendant/Counterplaintiff Exhibit 10, paragraph 1(A), p. 3.

**12.** Defendant/Counterplaintiff Exhibit 10, paragraph 1(B), pp. 3 and 4.

aircraft fuel may be stored within the integral fuel tanks installed in Tenant'S [sic] aircraft or other transportation related equipment, in which event any such substances shall be delivered in amount, and stored and used, as approved by Authority in accordance with the ... rules, regulations and statutes in forces and effect during the term of the Lease." [13]

As noted above, it is the Debtor's contention that based upon the agreement and the representation of the Airport Authority, the Debtor expended substantial money and time developing its FBO at the Naples Airport and, therefore, has been injured and is entitled to money damages. Nonetheless, the Lease Agreements signed by the Debtor explicitly state that, "[t]enant further agrees that any alterations, additions and improvements made to the Leased Premises during the term hereof, will become property of the Authority upon installation, shall not be removed, and shall remain on said Leased Premises upon the expiration of the term of the Lease." [14]

On February 17, 1997, the Airport Authority issued the Debtor a fifteen-year fueling permit (the "Fuel Permit"), which provided in part:

> Permittee is authorized to dispense fuel into aircraft owned or leased by the Permittee. In addition, Permittee is authorized to dispense fuel to its sub-tenants or other individuals or entities storing aircraft at the Permittee's Leased Premises provided that the sub-tenant or individual or entities storing aircraft at the Permittee's Leased Premises has entered into a sub-lease or a storage agreement with a duration of six months

or more. *Permittee shall be restricted from selling aircraft fuel to other airport users, including, locally based and transient aircraft. Fueling of any aircraft not specifically authorized by the Permit shall constitute a violation of this Permit and, consequently, may cause immediate revocation of said Permit. Upon request by the Authority, Permittee shall provide evidence of ownership or lease of aircraft being fueled, and a copy of the sub-lease or storage agreement.* Leases or ownership interests which are determined to have been created simply as a means of affording access to the Permittee's fueling facilities shall not be considered valid.[15] (emphasis added).

On November 16, 1999, the Airport Authority sent a letter to the Debtor indicating this letter was a follow up of the meeting held on October 27, 1999, regarding the agreement between the parties with respect to the Prepaid Fuel Purchase Program. The letter indicated that the Debtor "will participate in the prepaid fuel program by depositing a minimum of ten thousand dollars in an account with the Naples Airport Authority for the purpose of purchasing fuel at the prepaid discounted fuel rate." [16] The letter further indicated that the Airport Authority would audit the Debtors use of the prepaid fuel program and the following records should be kept by the Debtor: "(I) Sales order slips with aircraft tail numbers and customers names, (II) corresponding invoices, showing break out of fuel and other services purchased. (III) Proof of payment in form of i.e. credit card slips copies of checks,

---

13. Defendant/Counterplaintiff Exhibit 10, paragraph 5(A), p. 9.

14. Defendant/Counterplaintiff Exhibit 10, paragraph 8, p. 12.

15. Plaintiff's Exhibit No. 4, page 1–2, para. II(A).

16. Plaintiff's Exhibit No. 11.

and cash receipts listing."[17]

On August 15, 2002, the Airport Authority sent a letter to the Debtor, alleging that the Debtor had failed to comply with its Lease Agreements and its Fuel Permit. The letter further stated that the Debtor's non-compliance with the Airport Rules and Regulations had been a "chronic, constant problem over the years."[18] The letter further informed the Debtor that it was in "material default of its obligations under the Second Lease dated August 1, 1997, as amended, and its First Lease dated November 1, 1995."[19] The Airport Authority thereby notified the Debtor that they were in violation of the Airport's Nonpublic Aircraft Fuel Dispensing Permit and that the Debtor was also in violation of the Rates and Charges associated with the Prepaid Fuel Purchase Program.

The Airport Authority in their letter notified the Debtor that "[b]ecause of the violations, and pursuant to paragraph II of the Fuel Permit, Jet's Fuel Permit is revoked immediately." The letter further indicated that if the Airport Authority determined that the Debtor "remedied its non-compliance with its Leases," they would consider reinstating the Debtor's Fuel Permits. Moreover, if the Debtor was not in compliance within fifteen days of the receipt of the letter, the Fuel Permit and the Leases would not be reinstated and the termination would be set for August 30, 2002. The Debtor did not respond to the Airport Authority's letter nor did the Debtor correct the violations pursuant to paragraph II of the Fuel Permit. Rather, the Debtor immediately expanded its unlawful activities by beginning to fuel transient aircraft at its ramp located at the Naples Airport and filed a declaratory relief action against the Airport Authority.

## LITIGATION BACKGROUND

Prior to the commencement of this Chapter 11 case of the Debtor, there were two separate civil suits pending between the Debtor and the Airport Authority. The Debtor filed the first action, now referred to as the "Eviction Action," in August of 2002. The Debtor sought declaratory relief from the Circuit Court for the Twentieth Judicial Circuit in and for Collier County, Florida, (the "Circuit Court") in the case styled *Jet 1 Center, Inc. v. City of Naples Airport Authority,* Case No. 02–3331–CA, to determine its rights to continue to fuel airplanes at the Naples Airport and to participate in a Prepaid Fuel Purchase Program. The Debtor also sought a determination that it still has a valid lease in real property located at the Naples Airport and owned by the Airport Authority.

On September 27, 2002, the Airport Authority filed its Answer and Counterclaim in which it contended: (1) the Airport Authority validly revoked the Fuel Permit previously granted to the Debtor; (2) the Airport Authority has the right to terminate and prohibit the Debtor from participating in the Prepaid Fuel Purchase Program; and (3) the Lease Agreements between the Debtor and the Airport Authority were effectively terminated based on the breach of the Leases by the Debtor prior to August 15, 2002. This litigation is referred to by the parties as the "Eviction Action," because the Airport Authority counterclaimed and sought to evict the Debtor and its subtenants from the leased premises at the Airport.

After learning about the Debtor's apparent abuse of its fuel programs, the Airport

---

17. *Id.*

18. Defendant/Counterplaintiff Exhibit 87.

19. *Id.*

Authority, on November 8, 2002, amended its fueling regulations to restrict the fueling activities of all the Airport Authority's tenants holding fuel permits.[20] On December 9, 2002, after determining the Debtor was in violation of the newly enacted November 8, 2002 regulations, the Airport Authority filed its own action in the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida in the case styled *City of Naples Airport Authority v. Jet 1 Center, Inc.*, Case No. 02–5010–HDH. The Airport Authority in this action sought an injunction against the Debtor to enjoin Jet 1's blatant violations of promulgated government regulations pertaining to the dispensing of fuel at the Naples Airport. This second action has been termed the "Injunction Action."

In response to the Airport Authority's suit for injunction, the Debtor filed an Answer and Affirmative Defenses, and later filed Amended Affirmative Defenses, including: (1) waiver; (2) estoppel; and (3) illegal regulations based on the retaliation of Bill of Attainder. The facts as set forth in the Debtor's amended affirmative defenses overlapped the subject matter of the Eviction Action. The Debtor attempted on several occasions to have the Eviction Action and the Injunction Action tried together. However, the Circuit Court refused to consolidate the cases. In due course, the Injunction Action was set for trial.

On the eve of the Injunction Action trial, the Debtor moved to file second amended affirmative defenses and a new counterclaim. The Debtor also filed a Motion to Continue the Trial, urging the Circuit Court to allow the Debtor to serve additional defenses, including, the defense of unconstitutional illegal impairment of contract rights and violations of State Antitrust Statutes. The Circuit Court denied the Debtor's Motion to Continue the Trial and denied the Debtor's Motion to Add Additional Affirmative Defenses and the Counterclaim. The Circuit Court concluded that the Debtor had waited too long to assert these known defenses for the first time and was barred from raising them that late in the litigation.[21]

After a three-day bench trial, the Circuit Court Judge in the Injunction Action orally announced its decision in favor of the Airport Authority. The Circuit Court held in its decision that (1) the Airport Authority properly promulgated legal and valid regulations concerning restrictions imposed on fueling activities of the Debtor at the airport; (2) the Debtor flagrantly and without justification violated the regulations promulgated by the Airport Authority; (3) the Debtor engaged in a pattern of fraud or subterfuge in dealing with the Airport Authority's approval of subleases; (4) that the fuel permit issued to the Debtor had been properly terminated; and (5) the Debtor violated the Leases and Regulations prior to August 15, 2002, when the Airport Authority tendered its letter to the Debtor specifically identifying the violations and setting an August 30, 2002 termination date.[22]

After the trial in the Injunction Action and before the ruling of the Circuit Court could be reduced to writing, the Debtor filed its Petition for Relief under Chapter 11 of the Bankruptcy Code. By virtue of operation of the automatic stay, the Airport Authority was prohibited and stayed

---

**20.** Plaintiff's Exhibit No. 5.

**21.** *City of Naples Airport Authority v. Jet 1 Center, Inc.*, Case No. 02–5010 CA–HDH, Collier County, Florida, Circuit Court, Tr., Vol. I through Vol. III is in reference to Circuit Court trial transcript of the Injunction Action. Tr., Vol. I, pp. 30–32.

**22.** Tr., Vol. III, pp. 562–583.

to take any further actions, including the entry of a formal written order in the Injunction Action.

On December 31, 2003, the Airport Authority filed a Motion for Relief from Stay seeking leave to proceed and complete the Injunction Action and requesting the Circuit Court to enter a formal written final judgment in conformity with its oral ruling announced from the bench at the conclusion of the trial.[23] This Court granted the Motion and the Circuit Court entered a Final Judgment in favor of the Airport Authority on March 19, 2004. It should be noted at this point that the Circuit Court expressly declined to consider and rule on the validity *vel non* of the Debtor's Lease Agreements with the Airport Authority; the Debtor's right to occupy the non-residential property located at the Naples Airport; and the validity *vel non* of the subleases executed by the Debtor.

On January 16, 2004, the Debtor filed a Motion for an Order Authorizing Assumption of Unexpired Leases of Nonresidential Real Property with City of Naples Airport Authority.[24] The Debtor in its Motion requests this Court to enter an order pursuant to Section 365(a) of the Bankruptcy Code, authorizing the Debtor to assume the unexpired leases of the non-residential real property located at the Naples Airport.

On February 19, 2004, shortly after the commencement of the Chapter 11 case, the Debtor filed a Notice of Removal of a civil suit, the Eviction Action, originally commenced by the Debtor pursuant to F.R.B.P. 9027(b), thereby initiating the above-captioned adversary proceeding.

Once the Eviction Action was removed to this Court, the Debtor filed its Motion for Leave to file a Second Amended Complaint and to Join Additional Defendants.

In due course, this Court heard argument in support of and in opposition to the Motion for Leave to amend and, ultimately, this Court granted the Debtor's Motion and allowed the Debtor to file its Second Amended Complaint. On May 14, 2004, the Debtor filed its Second Amended Complaint setting forth ten separate claims in ten separate counts.

On April 2, 2004, the Airport Authority filed its Motion for Summary Judgment with Respect to its Motion for Relief from the Automatic Stay to Proceed with Eviction and Motion for Summary Judgment in Opposition to Debtor's Motion to Assume Non-Residential Leases.[25] On May 14, 2004, notwithstanding the agreement of the parties to defer ruling on the Motion for Summary Judgment, this Court entered an Order deferring the ruling on the Motion pending the resolution of the Motion to Remand filed in Adversary Proceeding No. 04–110.[26]

On September 22, 2004, the Airport Authority filed its Motion for Summary Judgment and Judgment on the Pleadings with respect to the Second Amended Complaint.[27] In due course, the Motion for Summary Judgment and the Judgment on the Pleadings was set for hearing and this Court heard and considered extensive oral argument in support of and in opposition to the Motion, coupled with extensive submissions by the parties of legal authorities supporting their respective positions. On

23. General Case No. 03–26514, Docket No. 6.

24. General Case No. 03–26514, Docket No. 40.

25. General Case No. 03–26514, Docket No. 137.

26. General Case No. 03–26514, Docket No. 164.

27. Adversary Proceeding Case. No. 04–110, Doc. No. 66.

February 15, 2005, this Court entered its Memorandum Opinion and Order granting in part and denying in part the Motion for Summary Judgment and Judgment on the Pleadings with respect to Second Amended Complaint.[28]

In its Order, the Court granted in part the Motion of the Airport Authority dismissing with prejudice eight of the ten claims asserted in the Second Amended Complaint. This left for disposition the Debtor's claim set forth in Count I, limited to the Debtor's right to a lease that the Debtor had with the Airport Authority and Count VIII, the claim for damages based on the theory of Promissory Estoppel.

On February 28, 2005, the Debtor filed its Motion for Summary Judgment on Motion for an Order Authorizing Assumption of Unexpired Leases of Nonresidential Real Property with City of Naples Airport Authority.[29] In their Motion the Debtor contends the Leases were not terminated prepetition and the Debtor has the ability to assume the Leases pursuant to Section 365(a) of the Bankruptcy Code.

On May 4, 2005, at the duly scheduled and noticed hearing on the two remaining issues, this Court limited the issues in the Debtor's claims to: (1) the question of whether the Airport Authority had unequivocally terminated its lease with the Debtor on August 15, 2002, when the Airport Authority tendered its letter to the Debtor or prior to the commencement of the Chapter 11 case; and (2) the claim of the Debtor based on the theory of Promissory Estoppel. The Court heard argument of counsel for the Debtor and for the Airport Authority, considered the testimony of the witnesses, together with the relevant portion of the record, and based on same now finds and concludes as follows.

**28.** Adversary Proceeding Case. No. 04–110, Doc. No. 105.

## ASSUMPTION OF LEASES PURSUANT TO 11 U.S.C. SECTION 365

A debtor's right to assume an unexpired lease is governed by Section 365 of the Code which provides in part:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of further performance under such contract or lease.

By virtue of an amendment to Section 541 of the Bankruptcy Code in 1986, the interest of a debtor under a lease of non-residential property that has been terminated prior to the commencement of the case is no longer property of the estate, thus no longer assumable, pursuant to Section 541(b)(2). Therefore, before one is able to consider Section 365(b), which governs a debtor's right to assume a non-residential lease, it is necessary to determine whether or not the Leases involved in this matter were still valid and enforceable under the applicable law of this State at the commencement of the Chapter 11 case of the Debtor. Paragraph 8(b) of the

**29.** General Case No. 03–26514, Docket No. 321.

Leases deals with this subject and provides in part:

"(1) *Termination.* If an event of default occurs, Authority shall have the right, with or without notice or demand, to immediately terminate this Lease, and recover possession of the Leased Premises or any part thereof and expel and remove therefrom Tenant and any other person occupying the same, by any lawful means, and again repossess and enjoy the Leased Premises without prejudice to any of the remedies that Authority may have under this Lease, or at law or equity by reason of Tenant's default or of such termination.

(2) *Continuation After Default.* Even though Tenant has breached this lease and/or abandoned the Leased Premises, at Authority's option, this Lease may continue in effect, and Authority may enforce all of its rights and remedies under this Lease, including (but without limitation) the right to recover Rent as it becomes due, and Authority, without terminating this Lease, may exercise all of the rights and remedies of a landlord under the laws of the State of Florida." [30]

## COUNT I—WHETHER THE AIRPORT AUTHORITY HAD UNEQUIVOCALLY TERMINATED IT LEASES WITH THE DEBTOR

Based on the foregoing it is appropriate for this Court to consider first whether or not the Leases between the Debtor and the Airport Authority were properly terminated prepetition.

■ It is the well established law of this State governing the relationships of landlords and tenants on commercial leases that, upon default or breach of the lease agreement by lessee, the lessor has the following options: "(1) the landlord may treat the lease as terminated and retake possession for its own account, thus terminating any further liability on the part of the lessee: (2) the lessor may retake possession of the premises on account of a lessee, holding the lessee liable for the difference between rental fixed by the lease and the amount which in good faith the lessor was able to recover as mitigation from reletting the premises; or (3) the lessor may stand by and do nothing, holding lessee liable for full rent due if there is an acceleration clause, and the lessor has the right to exercise acceleration." *Coast Fed. Sav. & Loan Ass'n. v. DeLoach,* 362 So.2d 982 (Fla. 2d DCA 1978); *Jimmy Hall's Morningside v. Blackburn & Peck Enter., Inc.,* 235 So.2d 344 (Fla. 2d DCA 1970).

■ Furthermore, in order for a lease to be terminated pre-petition, three elements need to be proven: (1) there must have been a default; (2) clear notice must have been given that the lease would be terminated if the default is not timely cured; and (3) the debtor must have failed to effectuate the cure within the cure period, which expired pre-petition. *In re Stress Simulation Sys., Inc.,* 130 B.R. 351 (Bankr.M.D.Fla.1991); *In re PAVCO Enters., Inc.,* 172 B.R. 114 (Bankr.M.D.Fla. 1994); *In re Gande Rests., Inc.,* 162 B.R. 345 (Bankr.M.D.Fla.1993).

■ In the present instance, it is without dispute that the Lease Agreements between the Debtor and the Airport Authority, dated November 1, 1995 and August 1, 1997, provide that violations of the regulations of the Airport Authority are violations of the Leases. In particular, Section 10 of the Leases requires that the Debtor abide by the Airport Authority's Rules and Regulations, including Rates

---

**30.** Plaintiff's Exhibit No. 1, page 20, para. 8(b).

and Charges established thereunder, as provided under Section 3 of the Lease Agreements. There has been a specific finding of fact that the Airport Authority's Rules and Regulations are lawful, the Debtor violated those Rules and Regulations, and the violations were "actual and material breaches by Jet 1." [31]

In addition, the Circuit Court noted that the Airport Authority "consistently warned Jet 1 that the defendant appeared to be in violations of the standard lease agreement and the fuel permit." [32] The Court stated that "[i]t just kept going on until … the Airport Authority finally concluded … if they didn't take some action, the defendant was going to eat their lunch." [33] Moreover, the Court stated, "[s]o I think the actions clearly reflect, not just sustained, but really chronic violations, including, quite frankly, there is clear evidence to support that there was a subterfuge or deception that—because of these secondary addenda to the contracts" [34] the Debtor clearly violated their Leases, and therefore, defaulted on their Lease Agreements.

This record leaves no doubt that the Debtor was in default under the Lease Agreements. The letter dated August 15, 2002, gave notice to the Debtor that the Lease Agreements would be terminated if the default was not cured by August 30, 2002. The Debtor not only failed to effectuate the cure within the cure period, but also, continued to violate the Lease Agreements by fueling transients, an act in which the Debtor admits they did not engage prior to August 15, 2002. [35]

The record is clear that the Debtor was given ample opportunity to cease its unlawful conduct within fifteen days of receiving the August 15, 2002 letter. Nonetheless, the Debtor chose to continue its violations by fueling transients, and the Airport Authority, in declaration of the defaults, sought remedy by having made demand on the Debtor for acceleration of the rents on September 18, 2002. It is imperative to note at this point that on December 30, 2004, the Airport Authority filed its Second Amended Counterclaim and withdrew its claim for acceleration of rent. [36]

This Court is satisfied that the Airport Authority clearly expressed in its September 18, 2002, letter that "this letter will confirm that the time period for curing defaults by Jet One Center, Inc. with respect to defaults under the leases has expired. Further, The City of Naples Airport Authority has elected to terminate the subject leases," [37] and that "possession is to be surrendered at the end of the time period." [38] Thereafter, the Airport Authority filed its Injunction Action.

On November 13, 2002, the Airport Authority, reinforcing its position, tendered its third letter to the Debtor's attorney. The Airport Authority again notified the Debtor that "[s]ince November 8, 2002, your client has continued to dispense aviation fuel from its stock of fuels directly into all aircraft which desire fuel at the Jet

31. *City of Naples Airport Authority v. Jet 1 Center, Inc.*, Case No. 02–5010 CA–HDH, Collier County, Florida, Circuit Court, Final Judgment, Exhibit A, p. 568.

32. *Id.* page 572.

33. *Id.*

34. *Id.*

35. Tr. Trans. Vol. I, page 98, line 5.

36. Adversary Proceeding Case. No. 04–110, Doc. No. 92.

37. Defendant/Counterplaintiff Exhibit 91.

38. *Id.*

1 ramp."[39] The Debtor was further instructed to "immediately cease dispensing fuel into any aircraft other than Jet 1 Center, Inc. aircraft." Furthermore, if the Debtor continued to violate the Permit and current Rates and Charges, "the Permit shall be deemed revoked and such continued violation shall be deemed a material breach of the lease agreements,"[40] and the "Permits have already been lawfully terminated and the material defaults under the lease agreements have already occurred."[41]

Based on the foregoing, this Court is satisfied that the Airport Authority on August 15, 2002, placed the Debtor on notice of its defaults of the Lease Agreements and allowed the Debtor to cure such defaults within the specified date of August 30, 2002. This Court is further satisfied that the Airport Authority on September 18, 2002, notified the Debtor that the time for curing the defaults had expired and the Airport Authority elected to terminate both Lease Agreements. Furthermore, this Court is satisfied that the November 13, 2002, letter reinforced the Airport Authority's position, in that it notified the Debtor that if it continued to violate the Permit and current Rates and Charges, the Permits were deemed revoked and the continued violations were nonetheless a material breach of the Lease Agreements of the nonresidential property located at the Naples Airport.

Based on this record, this Court is satisfied and finds that the Leases were effectively terminated upon the Debtor's failure to cure the default within the time fixed in the Notice, if not by the August 15, 2002 notice, then certainly by the letter date September 18, 2002, which unequivocally put the Debtor on notice that the Leases are unconditionally terminated. Thus, the Leases were not the property of the estate on the date of the commencement of the Chapter 11 case by virtue of Section 541(b)(2). Accordingly, the claim of the Debtor is meritless and, therefore, the claim of the Debtor that it had a valid Lease on the date of the commencement of the case as set forth in Count I of the Second Amended Complaint shall be denied and dismissed with prejudice.

■ Assuming without conceding that this Court's conclusion that the Leases were not effectively terminated prior to the commencement of the case, the Debtor cannot assume the Leases in question for the following reasons:

1. Cure, or provide adequate assurance of prompt cure;

2. Compensate, or provide adequate assurance of prompt compensation, for any pecuniary loss resulting from such default;

3. Provide adequate assurance of future performance.

In addition, by virtue of Section 365(d), the debtor is supposed to perform all covenants in the lease sought to be assumed. Nonetheless, there is no question that this record is devoid of any testimony or evidence which would support that the Debtor is able to meet the above-mentioned requirements for assumption, as required by Section 365(b)(1)(C) of the Code. For the reasons stated, this Court is satisfied that the Debtor has no right to assume the Leases under consideration and, therefore, the Debtor's Motion for an Order Authorizing Assumption of unexpired Leases of Nonresidential Real Property with City of Naples Airport Authority is without merit and, its Motion for Summary Judgment

---

**39.** Defendant/Counterplaintiff Exhibit 103.

**40.** *Id.*

**41.** *Id.*

shall be denied and the Airport Authority's Motion for Summary Judgment in Opposition to Debtor's Motion to Assume Nonresidential Leases shall be granted.

### COUNT VIII—PROMISSORY ESTOPPEL

In Count VIII, the Debtor relies on the doctrine of *promissory estoppel* and requests this Court to enjoin the Airport Authority "from enforcing [its regulations]" and award the Debtor money damages against the Airport Authority.[42] It is the Debtor's contention that it relied upon the agreements and representation by the Airport Authority that it would be able to fuel its aircraft and the aircraft it had under long-term leases. The Debtor contends that as a result of the agreements with the Airport Authority it expended substantial money and time developing its FBO business at the Naples Airport. The Debtor further contends that the Airport Authority, with knowledge of the Debtor's reliance of the Lease Agreements changed the regulations governing fueling so that the Debtor could no longer fuel aircraft it had under long-term leases, thus, the Debtor has been injured by the changed regulations.

It is the Airport Authority's position that the Circuit Court has already rejected the Debtor's *promissory estoppel* affirmative defense. The Circuit Court in addressing the affirmative defense of promissory estoppel stated that, "[s]o there's really—really no viable support for either the affirmative defenses that were raised to this by the defendant or to the interpretation that they've provided under their contact agreement." [43]

The Doctrine of Estoppel can only be applied against the government entity only where "... (A) property owner (1) in good faith (2) upon some act or omission of the government (3) has made such a substantial change in position or has incurred such extensive obligations and expenses that it would be highly inequitable and unjust to destroy the right." *The Hollywood Beach Hotel Co. v. The City of Hollywood*, 329 So.2d 10, 15 (Fla. 1976), *citing Sakolsky v. City of Coral Gables*, 151 So.2d 433 (Fla.1963). In as much as the doctrine may apply to the government entity, estoppel is subsequently not applied to government agencies as freely as against individuals. *Id.; see also, Macnamara v. Kissimmee River Valley*, 648 So.2d 155, 163 (Fla. 2d DCA 1994) (finding that such claims may only be pursued in rare instances where there are exceptional circumstances); *Watson Clinic v. Vicente Verzosa, M.D.*, 816 So.2d 832, 834 (Fla. 2d DCA 2002) (stating that a party raising estoppel must prove its elements by clear and convincing evidence).

This record is devoid of any evidence that the Debtor justifiability relied on the alleged promised of the Airport Authority and expended substantial sums for the construction of the FOB facility. It is without dispute the Debtor had ample opportunity to read the Leases prior to executing them; the Debtor had the opportunity to present the Leases to his attorney; and the Debtor was not forced into signing the Leases. Notwithstanding the imperative fact, it was the Debtor's "chronic violations," [44] as noted by the Circuit Court, coupled with the continuous deception even after the Debtor was noti-

---

**42.** Adv. Pro. Case No. 04–110, Docket No. 29, Paragraphs 99–100.

**43.** *City of Naples Airport Authority v. Jet 1 Center, Inc.*, Case No. 02–5010 CA–HDH, Col-

lier County, Florida, Circuit Court, Final Judgment, Exhibit A, p. 575.

**44.** Id. at 572.

fied of the violations, that the Debtor failed to cure any and all violations as requested several times by the Airport Authority. Based on the above, it is this Court's determination that the Debtor's discussions with the Airport Authority prior to the execution of the Lease Agreements were insufficient to establish reasonable reliance by the Debtor that the Airport Authority would not modify the Leases. The Florida Supreme Court has stressed that the doctrine of estoppel cannot be used "to defeat the express terms of a contract." *County of Brevard v. Miorelli Eng., Inc.*, 703 So.2d 1049, 1051 (Fla. 1997) Furthermore, the Florida Supreme Court in *Sharrow v. City of Dania*, 83 So.2d 274 (Fla.1955), held that a property owner disputing the revocation of an erroneously issued permit could not invoke estoppel because his actual or constructive notice that the permit could have been changed or terminated.

Based on the foregoing, this Court is satisfied that the Debtor had sufficient knowledge of potential changes to the Fuel Permit prior to executing its Lease Agreements. In addition, the Debtor was aware that the Airport Authority expressly reserved the right to be the exclusive retail supplier of fuel at the Naples Airport and, based on the same, the Debtor was adequately forewarned that the Airport Authority may invoke its right to be the exclusive retailer of fuel at the Naples Airport.

In light of the foregoing, this Court is satisfied that since the Debtor had adequate notice of the potential changes to the Lease Agreements prior to execution of the Leases, the doctrine of *promissory estoppel* cannot be applied. Thus, the claim as set forth in Count VIII of the Second Amended Complaint shall be denied with prejudice.

## THE AIRPORT AUTHORITY'S COUNTERCLAIM

██ The Circuit Court found that the Debtor breached its duties under the Fuel Permit and the Leases when it violated the Rules and Regulations. *See supra* note 31, p. 21. The Debtor's fueling of transients, first under the guise of a sub-tenant agreement, then openly without concern for appearances, caused the Airport authority to suffer damages. The only question left for this Court is the amount of those damages.

██ The Airport Authority's injury is the profit lost from the gasoline sales made by the Debtor in violation of the various agreements and regulations governing the parties' relationship. The purpose of a damages award in a breach of contract case is to restore the injured party to the condition it would have been in had the contract been performed and the breach not occurred. *See, e.g., Mnemonics, Inc. v. Max Davis Assocs., Inc.*, 808 So.2d 1278 (Fla. 5th DCA 2002). If the Debtor had properly performed, the Airport Authority would have handled the fueling of the Debtor's "sub-tenants" and transients. Supplying the fuel to these customers would have resulted in whatever profit the Airport Authority made on such transactions. In order to place the Airport Authority in the position in which they would have been if the Debtor had performed properly under the agreements, the Airport Authority should recover its lost profits.

The majority of the evidence on the record came from the Airport Authority's expert, Henry Fishkind (the Expert). The Expert made the calculation of lost profit damages for the years 1997 to 2003 as follows.

The Expert first took the total number of gallons sold through the Debtor's

pumps, resulting in a final flowage number of 9,583,961 gallons. This number includes fuel sold through both the prepayment and full service programs. The specific flowage numbers are: (1) the amount the Debtor pumped into its long-term sub-tenants, 6,357,537 gallons; (2) the amount the Airport Authority pumped into transients, 2,523,609 gallons; and (3) the amount the Debtor pumped into transients after August 15, 2002, 702,815 gallons.

The amount the Airport Authority charges for fuel varies based on two factors, the fuel program from which the fuel is purchased by the customer, and the fees and markups charged by the Airport Authority. Customers purchase fuel at either a discount wholesale (the Fuel Program) rate or at a full-service retail (the Full Service) rate. For the Fuel Program, customers prepay $10,000 and are charged against that deposit for the amount of fuel they consume. The amount charged by the Airport Authority to the prepaid customers is a combination of the cost of the fuel, a flowage fee, and a markup. The last two numbers are based proportionally on the number of gallons purchased, and are determined on an annual basis by the Airport Authority based on budget projections.

Given these two variables, the Airport Authority charges two prices each year, one wholesale and one retail. Since the cost of fuel to the Airport Authority is identical regardless of which fuel program the customer chooses, the Airport Authority has two profit margins on the sale of fuel, one for the fuel sold through the Fuel Program and one for the fuel sold at Full Service.

The damage calculation relies on the assumption that all fuel pumped from the Debtor should have been pumped by the Airport Authority. Due to the different prices charged and the corresponding profit margins, an accurate calculation requires proportioning the number of gallons sold between Full Service and the Fuel Program. The Expert's calculations are based on the Airport Authority's numbers from 2004, in which approximately 54% of customers bought through the Fuel Program and 46% bought Full Service. The damages calculation is based on the number of gallons actually pumped through the Debtor's pumps, and the profits are based on the assumption that customers would have purchased 54% of those gallons through the Fuel Program and 46% through Full Service.

Estimating the number of gallons sold in both fuel programs, then factoring in the average profit margin in each category for each year, results in a Total Estimated Net Revenue figure of $10,079,868. This figure is the amount of revenue that the Airport Authority should have received, based on the amount of fuel that was pumped and the estimate of what would have been Full Service and what would have been Fuel Program if the Debtor properly performed. By servicing transients, the Debtor took the markup from the Airport Authority; Mr. Phillips testified that he sent the Airport Authority $.75 per gallon, so they were only denied part of the markup—but that amount is included in the calculation in the form of the payments made by the Debtor, which gets subtracted out of the net revenue portion of the damages calculation.

The net revenue figure is then offset by subtracting two figures, the payments made by the Debtor and the Airport Authority's costs avoided. While the Debtor fueled its sub-tenants and transients in violation of the agreements, it also made some payments to the Airport Authority. The actual payments made by the Debtor were $4,228,549. The Airport Authority's revenues must also be offset by the costs avoided in gasoline handling, calculated by

the Expert at $.283 per gallon, resulting in an offset of $1,998,080. These offsets result in the final compensatory damages figure of $3,853,239. This figure represents the profit that the Airport Authority would have realized had the Debtor properly performed under the agreements.

 Under Florida law, an award of compensatory damages must be based on actual loss, grounded in competent evidence, and proven with some degree of certainty. *See, e.g., In re Xavier's of Beville, Inc.,* 172 B.R. 667, 672 (Bankr. M.D.Fla.1994). However, the inability of the party seeking damages to give the precise amount does not preclude recovery where substantial damages are suffered. *Electro Services, Inc. v. Exide Corp.,* 847 F.2d 1524, 1528 (11th Cir.1988). " 'Uncertainty as to the amount of damages or difficulty in proving the damages will not prevent recovery if it is clear that substantial damages were suffered as a result of the wrong. Inability to give the exact or precise amount of damages does not preclude recovery....' " *Id.,* quoting *Conner v. Atlas Aircraft Corp.,* 310 So.2d 352, 354 (Fla. 3d DCA 1975). A compensatory damages award is proper if there is a reasonable basis in the evidence to support the amount. *See, e.g., Taylor v. Lee,* 884 So.2d 222, 224 (Fla. 2d DCA 2004).

In the instant matter, there is sufficient evidence on the record before this Court to justify a finding that the Debtor's breach injured the Airport Authority, entitling it to an award of compensatory damages. However, an assumption underlying the evidence on the record is that the Airport Authority would have serviced all the customers who the Debtor serviced, the premise underlying the Airport Authority's damages calculation is that, but for the fueling operations conducted by the Debtor in violation of the Fuel Permits, the Airport Authority would have in fact supplied those customers. This assumption is devoid of any competent evidence in the record and is a supposition without any competent proof to support it. For this reason, this Court is constrained to conclude that based upon this record the Airport Authority has not met its burden to prove damages by competent evidence. Therefore, this Court cannot award to the Airport Authority any damages based on lost profit.

However, in light of the fact that this Court is satisfied that the Airport Authority in fact suffered damages as a result of the violation of the Fuel Permits by the Debtor, the Airport Authority should be given an opportunity to present evidence of damages, if any, other than as a result of loss of profit. Such request shall be made within thirty (30) days from the entry of this Order, if so deemed to be advised.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the claim as set forth in Count I of the Debtor's Second Amended Complaint, specifically, the Lease Agreement be, and the same is hereby, denied and dismissed with prejudice. It is further

ORDERED, ADJUDGED AND DECREED that the City of Naples Airport Authority's Motion for Summary Judgment in Opposition to Debtor's Motion to Assume Non–Residential Leases (Doc. No. 137) be, and the same is hereby granted. It is further

ORDERED, ADJUDGED AND DECREED that the Debtor's Motion for Summary Judgment on Motion for an Order Authorizing Assumption of Unexpired Leases of Nonresidential Real Property with City of Naples Airport Authority (Doc. No. 66) be, and the same is hereby denied. It is further

ORDERED, ADJUDGED AND DE-CREED that the claim as set forth in Count VIII, Promissory Estoppel, of the Debtor's Second Amended Complaint be, and the same is hereby, dismissed with prejudice. It is further

ORDERED, ADJUDGED AND DE-CREED that the claims as set forth in Count I, Breach of the Fuel Permit, and Count III, Breach of the Pre–Paid Fuel Program, of the City of Naples Airport Authority's Second Amended Counterclaim be, and the same is hereby, granted. It is further

ORDERED, ADJUDGED AND DE-CREED that a status conference shall be held on _____, beginning at _____.m. at the United States Bankruptcy Courthouse, Fort Myers, Federal Building and Federal Courthouse, Room 4–117, Courtroom D, 2110 First Street, Fort Myers, Florida, to consider fees and cost.

A separate final judgment shall be entered in accordance with the foregoing.

### *ORDER ON DEBTOR'S EMERGENCY MOTION FOR STAY PENDING APPEAL OF THIS COURT'S FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION AND ORDER DATED AUGUST 26, 2005 AND FINAL JUDGMENT DATED SEPTEMBER 14, 2005*

(Doc. No. 199)

THE MATTER under consideration in the above captioned adversary proceeding in this Chapter 11 case of Jet 1 Center, Inc. (Debtor) is Debtor's Emergency Motion for Stay Pending Appeal of this Court's Findings of Fact, Conclusions of Law and Memorandum Opinion and Order dated August 26, 2005, and Final Judgment dated September 14, 2005 (Doc. No. 199) (the Motion for Stay Pending Appeal).

The Motion for Stay Pending Appeal is directed at the effectiveness of the Final Judgment entered by this Court on September 14, 2005 in the above-captioned adversary proceeding.

The Debtor seeks an order from this Court staying the effect of the Final Judgment pending an appeal, pursuant to Federal Rule of Bankruptcy Procedure 8005. One of the provisions of the Final Judgment requires the Debtor to vacate the premises. The Debtor contends that this Court lacks authority to order eviction and enforce an eviction, citing *In re Brickyard, Inc.,* 36 B.R. 569 (Bankr.S.D.Fla. 1983). The Debtor argues that if this Court is correct and the lease is no longer the property of the estate, then this Court has no jurisdiction over the rights to occupy the premises and the eviction is governed by local law, under which only the county court has jurisdiction under state landlord-tenant law. In any event, if eviction is ordered by the county court, the tenant is a tenant of sufferance and must be granted fifteen days to vacate the premises.

First, it should be pointed out that the issue of eviction in the claim asserted in the state court was removed from the state court to this Court by the Debtor and it ill-behooves the Debtor to now state that this Court lacks jurisdiction over the issue of eviction.

Second, this Court is satisfied that the decision of Judge Gassen in *Brickyard* furnished scant, if any, authority to support the proposition that the county court has exclusive jurisdiction, vis-à-vis this Court, to rule on the eviction and evict the Debtor. The facts situation involved in *Brickyard* bears no resemblance whatsoever with the facts involved in this case. This Court is satisfied that it has jurisdiction to enforce its own orders and final judgment,

and not to force the prevailing party to go to a different forum and seek enforcement of a final judgment of this Court.

■ The Debtor also argues that this Court should stay the enforcement of the Final Judgment because, based on the record consisting of testimony and documentary evidence presented, the four factors this Court must consider in deciding to grant a motion to stay pending appeal have been met. "These factors are (1) whether the movant has made a showing of likelihood of success on the merits, (2) whether the movant has made a showing of irreparable injury if the stay is not granted, (3) whether the granting of the stay would substantially harm the other parties, and (4) whether the granting of the stay would serve the public interest." *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. Unit A June 1981). *See also In re Section 20 Land Group, Ltd.*, 252 B.R. 819 (Bankr. M.D.Fla.2000).

■ In regards to the first factor, the Debtor argues that it has shown a likelihood of success on the merits. The argument is based on the contention that this Court erred in its conclusion that the lease in question was terminated. The Debtor argues that this Court confused the defaults alleged two letters sent by the Authority to the Debtor, one on August 15, 2002, the other on November 13, 2002 letter. The Debtor contends that the November 13, 2002 letter did not contain a termination under the basis of the alleged breaches of the lease which were the subject of the August letter. Based on this the Debtor argues that this Court erred in relying on the November letter for termination and the Debtor never had the opportunity in the preceding state court litigation or in this Court to defend against the charges set forth in the August letter.

The Debtor in effect asks this Court to reconsider its ruling. Determining wheth-

er the Debtor would ultimately prevail on appeal is beyond the scope of this Court's powers; however, this Court is satisfied that, based on the Findings of Fact and the Conclusions of Law already issued in this proceeding, the Debtor has not shown a likelihood of success on the merits.

The second factor considered by this Court is irreparable injury to the movant if the stay is not granted. The irreparable injury alleged by the Debtor is that the Debtor will be put out of business, which will result in the Debtor's employees losing their jobs, as well as the Debtor losing its investments in the business.

As to the former injury, while this Court is not indifferent to the effects of its orders, based on the record developed at the hearing to consider the Motion for Stay Pending Appeal, there is little evidence that the employees of the Debtor will be irreparably injured. As to the latter injury, it should be pointed out that the Debtor could never have permanently retained its investment in the facilities. The hangers constructed at great cost, which are the primary facilities of the Debtor, would have been forfeited eventually, due to a specific provision of the lease that upon termination the structure, in this case, the hanger and office facility, will become property of the Authority and the Debtor forfeits its rights to the improvements to the land leased from the Authority.

Moreover, the posited irreparable injury to the Debtor if the stay is not granted is countered by the substantial harm the Authority will likely suffer, particularly the loss of revenue which the Authority may realize upon reletting the premises when it is able to regain possession. The evidence presented in support of and in opposition to the second and third factors in considering the Motion for Stay Pending Appeal, irreparable injury to the movant and sub-

stantial harm to the other party is an equal balance. As both factors weigh equally, this Court is satisfied that the Debtor, as movant, has failed to carry its burden to establish to these two elements, as required to obtain a stay pending appeal.

Concerning the fourth requirement, whether granting the stay would serve the public interest, it cannot be gainsaid that there is nothing in this record to warrant the conclusion that the continuation of the fixed based operation by the Debtor would be in the public interest. This is so because if the Debtor is evicted the Authority would be in the position and willing to take over the operation. The Authority by taking over the operation could increase its revenues and, unlike the current amount it receives, which is approximately $38,000 per month, could be able to generate gross revenues of $200,000, less the projected operating cost of $80,000, leaving $120,000 net monthly revenues.

It is evident from the foregoing that it is in the public interest to preserve the financial health of the Authority, as it is required to continue to operate the airport without the contribution of any governmental subsidy or federal tax revenues for the operation of the facility. Based on the foregoing this Court is satisfied that the Debtor failed to establish requisite proof of the four factors outlined above as required by the law, and therefore his Motion for Stay Pending Appeal should be denied.

█ However, notwithstanding the foregoing, this Court is also satisfied that a temporary stay should be granted, giving the Debtor a ten day opportunity to seek a stay pending appeal from the district court and until the district court enters its ruling, if the motion is filed. However, in the event the motion is not filed, the Debtor shall vacate the premises within twenty days from the expiration of the ten days

granted to seek a stay pending appeal from the district court.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Debtor's Emergency Motion for Stay Pending Appeal of this Court's Findings of Fact, Conclusions of Law and Memorandum Opinion and Order dated August 26, 2005, and Final Judgment dated September 14, 2005 be, and the same is hereby, denied without prejudice subject to the conditions outlined above. It is further

ORDERED, ADJUDGED AND DECREED that the effect of the Final Judgment be, and the same is hereby, stayed for ten (10) days. If the Debtor seeks a stay pending appeal from the district court, the stay shall continue until the district court enters a decision. If the Debtor does not seek a stay pending appeal, it shall vacate the premises within twenty (20) days after the expiration of the initial ten (10) day stay.